## HARRISON v. HARKER et ux.

No. 2543.   Decided March 27, 1914.   On Application for Rehearing
July 13, 1914 (142 Pac. 716).

1. HABEAS CORPUS—CUSTODY OF CHILDREN—JURISDICTION OF COURT.
   In proceedings to determine the custody of an infant child in the custody of strangers and claimed by the parents, the court is controlled by what appears to be the best interests of the child, rather than by the legal rights of the parties to the litigation.[1]   (Page 551.)

2. HABEAS CORPUS—CUSTODY OF CHILDREN—PAROL AGREEMENTS—
   VALIDITY. A child is not the subject of a parol gift, and a mother of an illegitimate child who gives the child to a third person does not thereby authorize the third person to claim the child by reason of the gift alone; but his rights to the

---

[1] Stanford v. Gray, 42 Utah, 228, 129 Pac. 423; Hummel v. Parrish, 43 Utah, 373, 134 Pac. 898.

custody are inferior to the rights of the natural parents (Page 552.)

3. HABEAS CORPUS—CUSTODY OF CHILDREN—ABANDONMENT—EFFECT. Where a child is by its parent placed in the custody of a third person, and the parent has thereby abandoned the child, the parent, when seeking to obtain again the custody of the child, has the burden of showing that it is for the best interests of the child and society that custody of the child should be restored to him. (Page 553.)

4. HABEAS CORPUS—CUSTODY OF CHILDREN—ABANDONMENT—ACTS CONSTITUTING. An attempt by a parent to make a gift of a child to another with the present intention that the latter shall have the permanent custody of the child is not of itself an abandonment of the child by the parent. (Page 554.)

5. HABEAS CORPUS—CUSTODY OF CHILDREN—ABANDONMENT—ACTS CONSTITUTING. The mother of an illegitimate child intended before and at the time of the birth of the child to give the child to some one willing to receive it. She intrusted the matter to a third person who gave the child to a husband and wife desiring to adopt a child. In about three weeks after the mother surrendered custody she sought to have the child returned to her; but the husband and wife refused to surrender it. The mother was induced to part with the child to conceal her shame. Held, that she did not abandon the child, and, where she and the father of the child married, the father on habeas corpus on his own behalf, and on behalf of the mother, were entitled to the custody of the child as against the claim of abandonment. (Page 554.)

6. HABEAS CORPUS—APPEAL—CONCLUSIVENESS OF FINDINGS. In habeas corpus by a father acting for himself and the mother to obtain custody of their child, born out of wedlock, but made legitimate by their subsequent marriage, the proceeding will be considered on appeal as one in equity, so far as the conclusiveness of the findings of the trial court are concerned, and to overcome the presumption of their correctness, it must appear with at least reasonable clearness that the findings are against the weight of the evidence. (Page 555.)

7. HABEAS CORPUS—CUSTODY OF ILLEGITIMATE CHILDREN—EVIDENCE—SUFFICIENCY. In habeas corpus by a father, acting for himself and the mother, to obtain custody of their child, born out of wedlock but legitimatized by their subsequent marriage, evidence held to justify a finding that the parents were suitable persons to have the custody of the child. (Page 555.)

8. EVIDENCE—REPUTATION—ADMISSIBILITY. Where the character of a party is in issue, it is only the general reputation that may

be assailed which cannot be done by proof of particular acts of wrongdoing.   (Page 555.)

9. APPEAL AND ERROR—QUESTIONS REVIEWABLE—FINDINGS—EVIDENCE. Where a case was tried to the court, incompetent testimony which was objected to, and which the court ruled inadmissible, but which was in fact received, should be disregarded, and the court on appeal will presume that the trial court disregarded it in making its findings.   (Page 555.)

10. HABEAS CORPUS—CUSTODY OF CHILDREN—JUDGMENT.   In *habeas corpus* by parents for the custody of an infant child in the custody of strangers, the court awarding the child to the cusody of the parents may not compensate the strangers for their services and expenses in caring for the child.   (Page 560.)

11. HABEAS CORPUS—CUSTODY OF CHILDREN—ACTIONS—PARTIES EN-TITLED TO SUE.   A father of an illegitimate child who, by marrying the mother, makes the child legitimate may maintain *habeas corpus* for himself and the mother for the custody of the child.   (Page 564.)

12. BASTARDS—LEGITIMATION—ACTS OF PUTATIVE FATHER.   A putative father who went to a hospital before his child was born and made arrangements for the care of the mother during her confinement, and who paid the expenses therefor, and who, a few weeks after the birth of the child, acknowledged it as his own, and who demanded the custody of the child, and who, under oath, in a petition in *habeas corpus* for the custody and, in open court, claimed the child as his own, openly and publicly acknowledged the child.   (Page 564.)

ON APPLICATION FOR REHEARING.

13. BASTARDS—MARRIAGE OF PARENTS—EFFECT.   Where the parents of an illegitimate child married, the child became legitimate.   (Page 629.)

14. ADOPTION—STATUTORY PROVISIONS.   The statute providing that the consent of both parents is necessary to a legal adoption of a legitimate child impliedly authorizes a revocation of a merely oral arrangement at any time before the statute is complied with, and parents marrying after the birth of an illegitmate child may avoid an arrangement made by the mother before their marriage for the custody of the child, unless the statutory consent was in fact given, and the court entered judgment of adoption.   (Page 629.)

15. APPEAL AND ERROR—QUESTIONS REVIEWABLE—QUESTIONS RAISED FOR THE FIRST TIME ON APPEAL.   A question raised for the first time in the petition and argument for rehearing will not be considered.   (Page 632.)

McCARTY, C. J., dissenting.

APPEAL from District Court, Third District; *Hon. Geo. G. Armstrong,* Judge.

*Habeas corpus* by J. B. Harrison against David Harker and wife to determine the custody of an infant child.

Judgment for plaintiff. Defendants appeal.

AFFIRMED.

*Stokes* and *Bagley* for appellants.

*King & King* for respondent.

FRICK, J.

On the 12th day of July, 1912, the plaintiff, respondent here, as the father, and at the request of his wife, the mother of the infant child in question, filed his application in the district court of Salt Lake County, in which he prayed that a writ of *habeas corpus* issue against the defendants, who are appellants in this court, to require them to produce said infant child in court, and that the custody thereof be awarded to him.

We remark at the outset that this is another of those unfortunate cases which involves the future welfare of an infant child, which, in this case, was of the tender age of less than one year when this proceeding was commenced, and of the age of only a few hours when it passed into the custody of appellants. Where only property rights are in issue, or even where the life or liberty of adults is involved, however trying or complicated the case may be, we nevertheless, as a general rule, have no great difficulty in finding some satisfactory solution of the problems that may be presented; but where, as is the case here, the future welfare of an innocent and helpless infant and the affections of a young, inexperienced, and perhaps, at the time of the occurrences,

thoughtless mother are concerned, and where the conse-
quences of our decision might prevent an innocent child
from knowing its own parents, although they are both alive
and more than willing to assume the responsibility of
parentage, the case is quite different. Under such circum-
stances we cannot remain insensible to the importance of the
task nor of the magnitude of the responsibility that is im-
posed upon us. It doubtless is largely due to these con-
siderations, coupled with the fact that all of us are conscious
that in such cases our judgment may be more or less in-
fluenced by our feelings, that the judges of the courts of last
resort so often are found to entertain divergent views with
regard to what the result in a particular case should be.
While the adjudicated cases disclose that there is but little
difference among the judges with respect to the law, yet they
greatly differ with respect to what the result should be in
view of the facts and circumstances of a particular case.
While the case at bar also has its own peculiar circumstances,
nevertheless, in view of the whole record, the writer at least
finds no great difficulty in arriving at what to him seems a
just conclusion.

Passing, now, to the merits, we remark that upon a hear-
ing the district court awarded the custody of the child in
question to the respondent and his wife, father and mother
of the child. It is for the purpose of reversing that judg-
ment that this appeal is prosecuted. The facts are not very
numerous nor greatly involved, and with few unimportant
exceptions are not in conflict. The circumstances under
which the child in question passed into the custody of appel-
lants are substantially as follows:

Prior to July, 1911, the respondent, J. B. Harrison, and
Ella, his wife, were lovers and engaged to be married, and
in the month aforesaid she was about to become a mother.
They both discussed her condition, and, as I read the record,
he wanted to get married before the child was born, but she,
as the evidence shows, objected for the reason, as she says,
that she wanted to conceal her predicament from her father,

44 Utah 35

which, she said, could not have been done if they were married, and the child were born so soon after marriage. To accomplish her purpose of concealing her maternity, both she and respondent went to see a Mrs. Phillips, who was conducting what she calls a maternity home known as the Willowsmere Hospital, located on the outskirts of Salt Lake City. They went to the hospital to make arrangements with Mrs. Phillips on the 15th of July, 1911, and the child was born on the 17th of that month. Mrs. Harrison says that the child was born sooner than she expected, and for that reason she was wholly unprepared for the event; the fact being that she had no clothes whatever prepared for the little stranger, who proved to be a little girl. Before the child was born she made arrangements with Mrs. Phillips to have some one take the child as soon as it was born. Mrs. Phillips, it seems, always was in communication with some persons who desired to adopt infants, and among that number were appellants. Mrs. Phillips, however, tried to persuade the young mother from her purpose of giving away the child, telling her that she would surely regret it; but the young mother was determined at the time, and she freely concedes the fact, to conceal her motherhood from her folks, and especially from her father, who knew nothing about her condition, and to accomplish that purpose to let some one take the child as soon as it was born. Immediately after the child was born Mrs. Phillips informed the appellants that she had a child they could have; but after it was born, and before the appellants reached the hospital, she again spoke to Mrs. Harrison, telling her not to give up her child, but the latter seemed determined to carry out the plan she had mapped out for herself. The appellants lived on a farm and were conducting a small dairy business some twelve or more miles from Salt Lake City, and as soon as they were advised by Mrs. Phillips as aforesaid they went to the hospital to receive the child. Mrs. Phillips, in the meantime, had improvised some clothing for the infant. Appellants arrived at the hospital shortly after noon of the day the child was born, and about three o'clock of that day left for their

home with the child. Neither of the appellants saw Mrs.
Harrison at the hospital; but it seems that Mrs. Harrison
heard their name spoken while they were there, and also
learned where they lived. Mrs. Harrison's health seemed
more or less affected and she remained at the hospital with
Mrs. Phillips three, instead of two, weeks as originally in-
tended. After three weeks had elapsed Mrs. Harrison left
the hospital and went to her aunt's, a Mrs. Silcocks, and it
seems informed her of what she had done. It seems that the
aunt did not approve of what had been done, and she and
Mrs. Harrison, within three days after the latter had left
the hospital, went to the home of appellants and then and
there asked that the custody of the child be surrendered to
Mrs. Harrison. The only difference between the testimony
of Mrs. Harrison and her aunt on the one side and the appel-
lants on the other is that Mrs. Harrison and the aunt claim
that they demanded the child for Mrs. Harrison, while the
appellants contend that it was demanded for the aunt. It is,
however, quite immaterial which version is taken as the cor-
rect one, since, so far as appellants are concerned, Mrs.
Harrison had the legal right to demand the child as will be
seen hereafter, whether for herself or for her aunt. Appel-
lants very emphatically refused to give up the child, and it
seems that in the interview Mr. Harker, one of the appel-
lants, was not at all considerate of Mrs. Harrison's feelings.
He, it seems, was quite free in his accusations, although he
had never seen Mrs. Harrison before nor knew aught about
her, except the fact that she claimed to be the mother of a
child born out of lawful wedlock. He seemed to make the
most of that fact. Upon that subject Mrs. Harrison testified
that she and her aunt were at the house of appellants at the
time for the purpose of obtaining custody of the child for
about two hours; that at that time he said many harsh
things. She says:

"He said I wasn't a fit mother for the child. . . . I
don't remember all he said. I know he had me crying all
the time. He was talking to me cross and crabbed all the

time, insulting me. He had me crying all the time. I didn't talk much to him."

While Mr. Harker does not state in so many words that he was harsh to Mrs. Harrison, yet he admits that he said to her, "Why didn't you do the right thing and go and be married before the child was born?" and added, "she said nothing; she just sat with her head hanging this way." After appellants had refused to give up the child, Mrs. Harrison discussed the matter with the respondent, and they concluded to get married forthwith which they did on the 17th day of August, 1911, or just one month after the child was born, and only a few days after Mrs. Harrison demanded it from appellants as before stated. Soon after the demand had been made appellants went with the child to see Mrs. Phillips. They informed her of the demand and then insisted that they understood that the child had been given to them permanently. Mrs. Phillips assured them that such was the case, and in substance told them that the mother of the child had authorized her to give it to appellants, and that they had a right to keep it. It seems that the respondent happened to call at the hospital just at the time appellants were there. He went there he says, to pay Mrs. Phillips the remainder that was due her for taking care of Mrs. Harrison, and in view that the right to the custody of the child was under discussion, Mrs. Phillips introduced respondent to appellants as the father of the child. Appellants and respondent do not agree as to what took place or what was said regarding their right to the custody of the child. Appellants, in substance, contend that respondent told them then that they could keep the child, that he and its mother did not want it, and that he and she would consent to the legal adoption of the child by them. Respondent, on the contrary, denies that he made such statements. There is also a dispute as to the exact time when the foregoing interview took place. Mrs. Phillips also took part in this conversation, and she said while she was sorry that any misunderstanding concerning who should have the custody of the child had arisen, yet in case any proceedings were instituted

by the mother of the child, she would be compelled to take sides against her and to testify that she told the witness to give the child to some one, which direction she followed by giving it to appellants. At this interview Mr. Harker was again somewhat unsparing in his accusations. In addressing respondent, he said that they, the respondent and his wife, were willing enough to give the child away "as long as it covered up their crime." After this interview, and after the Harrisons had intermarried, they say that they then discussed the feasibility of instituting proceedings to recover possession of the child and had concluded to do so when Mrs. Harrison became quite ill and remained so until late in October, at which time she was able to be up again but was not in robust health during the whole winter. The clear inference from the evidence is that Mrs. Harrison's illness, and because they had not yet established a home, was the principal reason that the contemplated proceedings were suspended or delayed. Things ran along until some time in March or April, I think it was in April following, when the respondent went to the home of the Harkers and again demanded possession of the child, which was again refused. About two weeks later he again went to obtain possession of the child and told them that he would institute proceedings to obtain possession; but they again refused to give up the child. The evidence also shows that the Harkers own about one-half acre of ground with a dwelling house thereon in Taylorsville, a small village in Salt Lake County, that they are carrying on a dairy business in a small way, and that their monthly income in excess of what they eat amounts to about fifty-five dollars. Mrs. Harker at the time of the trial was thirty-six years of age. Mr. Harker's age does not appear; but it may be assumed that he was about the same age, or perhaps a little older. They had been married some fourteen years, and were childless because no children had ever been born to them during their married relation. No reason whatever is shown why they are not morally proper persons to rear a child. Mrs. Harker, before her marriage, was a nurse, and has had ample experience with children to make

her a fit person to have custody and control of a child. They also seem to have become attached to the child in question. The evidence shows that respondent was twenty-four years of age at the time of the trial, and, while the evidence is not clear, the inference is that Mrs. Harrison was at least not older than he; that he owned in his own right thirteen acres of land at Crescent, in Salt Lake County, with a water right, and that he farmed the same, which was very productive; that he was building a new house on the land when these · proceedings were commenced; and that in connection with his land he also farmed quite a large piece belonging to his brother. The evidence is without dispute that respondent and his wife have ample means to take care of themselves and the child. At the trial appellants sought to show that respondent was not a fit person to have custody of the child, and for that purpose produced one Shields as a witness. The record shows that while Mr. Shields was being examined the following occurred:

"Q. Do you know what his (respondent's) reputation is for integrity and morality—I mean his general reputation? A. Well, not a very good one, as far as I am concerned. Q. You say, as far as you are concerned. A. No, sir; he has put me to a lot of trouble and expense. Q. In what respect?

"Mr. King: Object to this examination as immaterial, irrelevant, and incompetent.

"The Court: Sustained.

"Mr. Stokes: Exception."

The record, however, shows that, nothwithstanding the court had sustained the objection, the witness had answered the question thus: "Well, I had a daughter had a child by him." Appellant's attorney then again sought to have the witness explain in what respect respondent's reputation was not good. Considerable discussion then ensued between court and counsel, and the court ruled that the witness could not give any particular instances of dereliction, but must confine his testimony to the general reputation of respondent. Appellant's attorney then said: "I will withdraw the

question; I think your honor is correct on that point." This ended the attempt to assail the general reputation or character of respondent. No attempt whatever was made to in any way assail the character or fitness of Mrs. Harrison, except the inferences that may be deduced from the fact that she had given birth to a child before she was married. It also appeared that a short time after appellants received the child it became afflicted with sore eyes, which required much care and attention, and that subsequently it had measles for a week or ten days. There were some other facts produced in evidence which, in view of the questions involved here, are not material.

The principal assignment of error is that the court erred in its findings of fact, and in awarding the custody of the child to its parents, Mr. and Mrs. Harrison, upon the foregoing facts. This court is now firmly committed to the doctrine that in such proceedings we will be controlled by what appears to be the best interests and welfare of the child, rather than by the naked legal right of those claiming it. (*Stanford v. Gray,* 42 Utah, 228, 129 Pac. 423; *Hummel v. Parrish,* 43 Utah, 373, 134 Pac. 898.) The doctrine generally prevailing in the United States, and the one adopted by this court in such cases, is clearly and correctly stated by the present Chief Justice in the last-cited case in the following words:

"The legal presumption is that it is for the best interests of the child and of society for the child to remain with its natural parents during the period of its minority, and be maintained, cared for, and educated by them and under their supervision and direction. But this is not an absolute right of the parent. The decisions rendered in this class of cases almost universally hold that where, as here, a parent has surrendered the control of his child when it was a toddling infant to other parties, and permitted them to maintain, clothe, feed, and care for it until it is eight or nine years of age, and a strong reciprocal mutual affection has grown up between the child and its foster parents, as in the case at bar, and the parent seeks to recover possession of the child, the natural or presumptive right of the parent cannot prevail, if the interests and welfare of the child forbid it. The law in such cases regards the welfare and permanent interests of the child much more important than the natural or presumptive right of the parent. In

other words, the paramount consideration in such cases is the well-being of the child. If it appears to the court that the physical, intellectual, social, moral, and educational training and general welfare and happiness of the child will be best promoted by leaving it with the foster parents, the presumptive right of the natural parent must yield to the interests of the child."

Appellants' counsel lay much stress upon the fact that Mrs. Harrison, before she was married, intended to and did authorize Mrs. Phillips to give the child to some one as soon as it was born, and that such intention was fully consummated. Authorities are cited which counsel maintain support their contention to the effect that a parent may by parol make a valid and binding gift of his minor child. In referring to respondent and the gift of the child, they, in their printed brief, say:

"He is now estopped to assert any claim upon the child. What rights the law made it possible for him to exercise he refused to take advantage of, and by his silence, and also by his overt acts in the premises, those rights he has now waived. The gift was most certainly and unequivocally made, after the fullest and most complete deliberation and consideration both on the part of the mother and also on the part of the reputed father; and the gift, too, was made under such circumstances and conditions as to amount to an abandonment of the child by them both."

We need not at this time devote much time or space to the question of gift. The people of this country sacrificed hundreds of thousands of lives and thousand of millions of treasure to destroy the theory that there can be such a thing as a property right in a human being, even though such being be of the lowest type, and by the same token the question that any one may claim any rights to a child by virtue of a gift alone is forever settled. That a human being cannot be made the subject of a gift has always been the rule at common law. The law upon that subject is well stated by Mr. Justice Brewer in *Chapsky v. Wood*, 26 Kan. 652, 40 Am. Rep. 321, where, in speaking to a question similar to the one involved here, the justice says:

"A child is not in any sense, like a horse or any other chattel, subject-matter for absolute and irrevocable gift or contract. The father cannot, by merely giving away his child, release himself from the obligation to support it, nor be deprived of the right to its custody. In this it differs from the gift of any article which is only property."

See, also, *In re Scarritt,* 76 Mo. 583, 43 Am. Rep. 768, where that court quotes and adopts the language of Mr. Schouler. Mr. Schouler, in concluding his statement, says:

"American courts hold fast nevertheless to the true interests and welfare of the child."

For that reason, those courts disregard the mere technical rights of the parties, and, in determining who shall have the custody of an infant child, place it where its interests and welfare are best subserved. Assuming, therefore, that Mrs. Harrison authorized Mrs. Phillips to give the child to some one, and that pursuant to such direction it was given to appellants, yet the latter cannot claim the child as their own by reason of the gift, nor can such gift, when standing alone, make their rights to have custody thereof superior or even equal to those of the natural parents. The mother could revoke or recall the gift as such at any time.

It, however, does not follow that, because a parent may not make an absolute gift of his child, he may not by his acts and conduct be held to have abandoned it. Where the latter is the case, those into whose custody the child was placed or given, may have acquired rights with respect to its custody and control which are paramount to the rights of the parent. Where an abandonment has actually occurred, the presumption that "it is for the best interests of the child and society" that the natural parent have custody and control of his own child may have been overcome, and, if so, the burden is then cast upon him to prove that the best interests and welfare of the child require that it be returned to him.

The question, therefore, arises in this case: Did the acts of Mrs. Harrison constitute abandonment of the child with-

in the purview of the rule just stated? In passing upon this question, courts are bound to keep in mind the fact that an attempt to make a gift of a child by a parent to another, with the present intention that such other shall have permanent custody and control thereof to the exclusion of the parent, is not alone sufficient to constitute abandonment under all circumstances. If such were the case, then every gift would be enforceable; if not as a gift, it nevertheless would be as an abandonment.

There can be no doubt that in the case at bar Mrs. Harrison, before and at the time of the birth of the child, intended that it should be given to some one willing to receive it. She intrusted that matter to Mrs. Phillips, who assured her that she was in communication with some good and suitable people who desired to adopt an infant child. While the mother's conduct clearly manifested an intention to give the child to some one it nevertheless, in my judgment, does not necessarily evince an intention to permanently abandon the child to any fate that thereafter might befall it. This conclusion is clearly demonstrated to be correct by the conduct of Mrs. Harrison immediately after she recovered from her confinement. In three weeks and three days after she had surrendered custody of her own child she seeks to have it returned to her. In other words, she, after only three weeks had elapsed, recalls her acts with respect to the gift of the child, just as we have seen the law says she might do. Under the law, therefore, appellants at that time had acquired no right to retain the custody of the child as against Mr. Harrison. They, as against the natural parent, had perhaps acquired a legal right to be compensated for what they had done for the child in the interim, but nothing more. The fact that appellants may be fit and proper persons to have custody of the child cannot affect the foregoing conclusions. The only important fact is that through Mrs. Phillips' influence the child was placed in good hands. Suppose it had happened that within the three weeks Mrs. Harrison had learned that appellants were clearly unfit and unsuitable persons to have custody of the

child; would any lawyer contend that if such had proved to be the fact, under the law Mrs. Harrison could not have demanded custody of the child, and that under such circumstances it would not have been awarded to her forthwith by any court of competent jurisdiction? Indeed, under such circumstances, it would have been her duty to recall the alleged gift of the child, and had she done so every one would have approved her act. The question, therefore, becomes pertinent: Did the mere fact that appellants proved to be good and suitable people affect Mrs. Harrison's right to recall the gift and demand the custody of the child within the time such demand was made? To hold that it did affect her right would, in my judgment, be tantamount to nullifying the very wholesome provision of the law which denies the right of a parent to give away his own child.

But in my judgment there are still other reasons why the facts in this case do not show an absolute abandonment of the child by Mrs. Harrison. In all such cases courts may not lose sight of the human equation 6, 7, 8, 9 involved in the transaction. To lose sight of that factor is to get away from the case entirely. In speaking of the factors that should be considered by the court in determining whether a party should be permitted to regain the custody of his child in cases where such custody has parted from him through his own acts or conduct, Mr. Church, in his work on *Habeas Corpus* (2d Ed.) p. 712, in a footnote so clearly states the rule that I hereby take the liberty to adopt his language, which is as follows:

"Very much depends, also, upon the motive which prompted the surrender of the custody by the parent, and the circumstances surrounding the transfer, as well as conditions which have changed since the transfer was made."

What, then, were the conditions which, to a large extent, may be said to have influenced the motives of Mrs. Harrison in giving away the child?

The evidence is undisputed that she was induced to part with the child for the reason that she wished to conceal her

shame from her folks, and especially from her father. Is it a crime for a young and inexperienced girl to seek to hide her shame from her own parents? If so, since when? It may be contended that such a reason is not sufficient to jus· tify the abandonment of an infant child. Granted. Yet it is one that no human court has a right to ignore. Just to what extent a young girl's mind or motives may be influenced by what she alone may know she may expect from an irate father when she has sinned against the very foundation of cultured society cannot well be judged, except by those who may have had a similar experience. Courts and judges who are merely called on to pass upon the facts after they have happened may well hesitate before they pronounce a judg· ment of condemnation upon the girl under such circum- stances. While in such cases the courts may be justified, and in certain circumstances may even be required, to con- demn the acts and conduct of the girl, yet they have no right to inflict what is tantamount to cruel and unusual punish- ment upon her by for all time depriving her of the right to have the care and custody of her own flesh and blood, unless it is clear that it is for the best interests and welfare of the child that custody be withheld from her. We may well pause in this case before we inflict such drastic consequences upon the mother of the child in question. It is very clear that Mrs. Harrison's heart, before and immediately after the birth of the child, was torn by the conflicting emotions of pride and fear on the one side and duty to her child upon the other. Pride and fear prevailed for the time being; but as soon as she had recovered from her confinement the better— the nobler—part of her nature asserted itself, and she at once attempted to right the wrong by recalling what she had done. Conceding that she grievously erred and had wronged the child, is that sufficient to shut the door of mercy against her for all time? I think not. I think Mrs. Harrison fully aton- ed for her weakness and wrong, and it lies neither in the mouth of the courts nor in the mouths of appellants to say that she should be deprived of her rights of parentage because of what she did under the circumstances. When the recall was

made no equities whatever had, or could have, arisen in favor of appellants. Again, in what way would any one, not excepting appellants, have suffered if they, as they should have done, had surrendered the child to the mother upon her demand? Nor could they after the recall acquire equities, since they kept the child against the consent of the parents. But let us assume that appellants may have had some slight excuse at the time to refuse to surrender the child to its mother. It was only a few days thereafter, however, when they sought to settle the matter by obtaining the legal consent of the parents to the adoption of the child. They utterly failed in that attempt, and for that reason they must be charged with the knowledge that they had neither the legal nor an equitable right to keep the child.

Nor does the fact that the bringing of this action was delayed as it was under the circumstances of the case affect the question. Had the delay lasted from three to eight years, as was the case in many of the cases that are usually cited, the conditions affecting the child, as well as appellants, might have become a factor. Nothing of that kind is present here, and I think no case can be found wherein it has been held that so short a delay, under circumstances such as are present here, is sufficient to create rights which overcome the presumption that exists in favor of the natural parents.

But have appellants a right to the child's custody for the reason that it is for the best interests and welfare that it remain with them? Upon that question we have the findings and judgment of the trial court against them. That court had the opportunity to see, hear, and observe the parties at close range, and in cases like the one at bar contact with the interested parties may be a great if not a controlling factor in arriving at a conclusion. If, therefore, this case were to be treated as a law action, the findings and judgment, in view of the evidence, would be conclusive upon us. But even though it be treated as an equity proceeding, as I think it must be, then again the presumption that we are bound to indulge in favor of the judgment has not been overcome. Before this presumption is overcome in equity

proceedings, it must be made to appear with at least reasonable clearness that the findings are against the weight of the evidence. This, in my judgment, was clearly shown in *Stanford v. Gray,* and for that reason the majority of this court reversed the case. But viewing the matter entirely apart from the presumptions in favor of the trial courts findings and judgment, still there is nothing in this case from which a court can say that the interests and welfare of the child in question demand that it be left with appellants. It is contended, however, that the foregoing conclusions are not justified because there is some evidence in the record showing the unfitness of the respondent to have the care and custody of the child. In the statement of facts we have set forth a verbatim copy of the record upon that question. There it appears that appellants attempted to show respondent's unfitness by assailing his "general reputation for integrity and morality." All the witness would say, however, was that respondent's general reputation was "not very good so far as I am concerned." The witness, when pressed further, disclosed his reason, which was that respondent had "put me (the witness) to a lot of trouble and expense." Now, the court rules that all this evidence was incompetent for the purpose of assailing respondent's general reputation with regard to the traits of character mentioned. Counsel acquiesced in the ruling, as the record shows, by withdrawing the question relating to specific matters, and said, "I think your honor is correct on that point." There can be no doubt of the correctness of the court's ruling. The rule has become elementary that, where the character of a witness or a party is being assailed, it is the general reputation that must be assailed, and that this may not be done by showing that the party assailed at some time or another was guilty of some derelictions. If character can be assailed in that way, it could easily be shown that there was neither a man nor woman in any community whose character was without a flaw. It may be assumed that no one is so pure that some personal enemy could not find something against the person's reputation or character. Every one is required when occa-

sion arises to defend his general reputation; but no one is required to descend to and explain all of his individual acts that may have taken place during his life. What the witness said in this case may or not be true. He may be mistaken with regard to the main fact. It may be that Mr. Harrison could have readily explained the charge against him if he were given opportunity. Where one has lived in a community as did Mr. Harrison according to Mr. Shield's own testimony, namely, "ever since a very small boy," he certainly must have established a reputation of some kind which must be known to his neighbors who when called on can testify regarding its quality. It was in the very teeth of the salutary rule that general reputation alone can be assailed that Mr. Shields was asked the questions which the trial court ruled were improper. But counsel now contend that the answer of Mr. Shields was not stricken from the record, and therefore it stands as evidence of the fact that respondent is an unfit and unsuitable person to have the custody of the child. This contention is manifestly wrong. Even though no objection had been made to Mr. Shields' statement, yet, in view that the case was tried to the court, the testimony should have been ignored by it, since it was clearly incompetent for any purpose. If, therefore, the trial court should have disregarded the statements, we must presume it did so, and this court is also by law compelled to disregard them. If the rule that incompetent evidence or statements of witnesses should be disregarded in arriving at a conclusion by the court in ordinary cases should be invoked, the reason for doing so is much stronger in a case where the welfare of an innocent child is involved. It is apparent from the record in this case that the court and counsel on both sides regarded the statements of Mr. Shields as improper, and therefore should receive no consideration. It may be that for that very reason respondent's counsel made no effort whatever to have him give his version of the affair alluded to by Mr. Shields. Why should counsel pay any further attention to the statement which the court ruled was incompetent and could not legally be considered, and es-

pecially after opposing counsel had given his judgment that the ruling was right? To now permit counsel to take advantage of the fact that Mr. Shields' statements were not stricken from the record would, to say the least, not only smack of strategy, but permit them to take advantage of both the law and their own wrong. This is not a case like many found in the books where it is sought to uphold a judgment which is claimed to be based upon improper or incompetent evidence to which no objection was made when it was produced. The case before us is one where the court expressly ruled that the evidence in question was improper, and for that reason supposed that it had been excluded from the record, in which conclusion he seems to have been mistaken, and because of that mistake it is now sought to rely on the incompetent evidence, not for the purpose of sustaining a judgment under circumstances where no objection to such evidence was interposed, but for the purpose of overthrowing a judgment where the evidence was objected to, but for some reason had crept into the record and remained there. This may not be done.

It is also insisted that the court erred in not requiring respondent to compensate appellants for their services and expenses in caring for the child. The court committed no error in that regard. As pointed out by Mr. Justice BREWER, in the case of *Chapsky* v. *Wood, supra,* proceedings like the one at bar are not intended to be used for the purpose of enforcing contracts or awarding damages for their breach, nor can they be used for the purpose of determining the rights and liabilities of parties as in other cases. The courts, both law and equity, are always open for the enforcement of rights of every kind or character. In a proceeding like this the only question involved is: Who should have custody of the child in question?

Finally, it is contended that according to the rule laid down in *Stanford v. Gray* and *Hummel v. Parrish, supra,* the judgment should be reversed. We have not the slightest disposition either to modify or depart in any degree from

the rule laid down in those cases. The rule, in my judgment, is not only the correct one, but it is the one that is supported by the great weight of authority. In the mind of the writer there was no question in either of those cases that the best interests and welfare of the children there in question required that they be left just where they were when the proceedings were commenced. In both of those cases to have taken the children and given them to the mother would have resulted in consigning them to a home in which, so far as the father was concerned, they were strangers and nameless. In the first of those cases the mother took the child from a good home and placed it among strangers for what I thought were not good reasons. In the second case the writer was convinced that the custody of the child was sought for selfish purposes. In both cases I was thoroughly convinced that to change the custody of the children could only result to their detriment. I am just as firmly convinced to the contrary in this case. Besides, in this case the child comes into its own. Under our law the Harrisons have legitimatized their offspring, and its social standing in their custody will be precisely the same as that of all legitimate children. The child, therefore, is not a partial stranger in their home, but is of their own flesh and blood, and as such, in my judgment, will receive the care and nurture to which it is by law and by nature entitled.

Since writing the foregoing the Chief Justice has prepared a dissenting opinion, and in view that he most vigorously, and, as I think, without his usual patience and calmness, insists that the majority of the court, in their conclusions, have offended against both law and morals, and have either misapplied or misconceived the evidence, I feel constrained to make a few further observations. After carefully reading the dissenting opinion, I am persuaded that in writing it the Chief Justice followed the good example of one other eminent Chief Justice of this country of whom it is said that in discharging his arduous duties he was required "to scorn delights and live laborious days." I greatly

44 Utah 36

regret that my convictions do not permit me to agree with the Chief Justice in his deductions, inferences, and conclusions. Convictions, however, are not a matter of choice. They grow, so to speak, and force the judgment to certain conclusions. I therefore cannot, at will, either create or change them, nor can I in all instances surrender them merely because mine do not square with those of my associates, although in many instances, as I conceived it my duty to do, I have deferred to their judgment. Much as I may regret our divergent views in this case, I nevertheless must follow my own convictions.

The principal grounds of the Chief Justice's dissent are: (1) That the plaintiff is an unfit person to have the care, custody, and control of his child; and (2) that he has no legal right, even as against a stranger, to bring an action in which it is alleged that an infant child is restrained of its liberty, and is detained by those who have no legal right to its custody and control. The conclusion of the Chief Justice that Mr. Harrison is not a fit person to have the care and custody of his own child is almost entirely based upon the statement of the witness Shields, which statement is set forth in both the prevailing and dissenting opinions. The Chief Justice takes issue with the majority of this court in their holding that, where a particular trait of character is in issue, its existence or absence must be shown by proving the general reputation of the person respecting the particular trait of character which is in issue. If the writer ever entertained any doubt respecting the correctness or utility of the rule laid down in the majority opinion upon that subject, the Chief Justice, in what he has said, has absolutely dispelled that doubt. In his dissenting opinion the Chief Justice bases his conclusion that Mr. Harrison is an unfit person to have custody and control of his child upon one statement made by the witness Shields, and upon his general deductions from other portions of the evidence. Notwithstanding the fact that even counsel for the appellants conceded that his question was improper, and that counsel for neither party, nor the trial court, regarded Mr. Shields'

statement as evidence for any purpose, the Chief Justice, nevertheless, uses it for the purpose of condemning Mr. Harrison. Moreover, this is done when it is as clear as any fact can be that the trial court would not have permitted Mr. Harrison to take issue with the statement by showing that it was false, or that the witness was mistaken. The trial court had ruled, and appellants' counsel acquiesced in the ruling, that the character of Mr. Harrison could neither be assailed nor supported, except by showing his general reputation. How could Mr. Harrison, therefore, meet the statement of Mr. Shields? Is it not manifest that he could not have done so, and therefore that it would be gross injustice to condemn him upon Mr. Shields' statement? In view of the record in this case, this would be true even though the Chief Justice were right in his contention that the statement was proper, since it was not considered as evidence by the trial court, nor by counsel for either side. What the Chief Justice says, therefore, not only amounts to condemnation without a hearing, but it in legal effect constitutes condemnation without an accusation in any form whatever. I am aware that cases are cited by the Chief Justice in support of his contentions. There always have been, and always will be, sporadic cases which are contrary to the general rule. The cases cited, in my judgment, are, however, not well considered nor well decided. If the evidence is proper in one kind of a case where character is in issue, it must be in all such cases. Would the Chief Justice contend that, where a witness' reputation for truth and veracity is assailed, the party assailing it can call other witnesses who would be permitted to detail the number of times the witness who is assailed has been guilty of making false statements? Again, if it were contended that a party to an action were dishonest, or that he was quarrelsome, and not a law-abiding man, could the particular trait of character assailed be shown by proving that in the first instance the party had been guilty of a number of dishonest acts, and in the second that he had frequently quarreled with his neighbors or others? If this can be shown, then each separate act be-

comes an issue in the case, and the issues may thus be multiplied indefinitely. This could only lead to confusion, and to avoid this is óne of the reasons why the general rule is generally adhered to by the courts. Of course much latitude is sometimes allowed on cross-examination. Moreover, when it is sought to prove a habit, such as habitual drunkenness, the courts, of course, permit evidence of individual instance, since that is practically the only way the habit may be shown. Mr. Shields' statement was therefore clearly incompetent as evidence, even though it had been received by the trial court. Most of the inferences and deductions of the Chief Justice are thus not only based upon incompetent evidence, but they are based upon a statement which was not received nor considered as evidence by any one interested in the trial, and hence could not have been met by counsel for the plaintiff.

While I cannot agree with the inferences and deductions of the Chief Justice which he makes and deduces from other facts and circumstances in the case, yet I have no desire to review those. He, like all of us, has a right to make his own inferences and deductions, and is alone responsible for them. All I desire to say in that regard is that the strictures which he is pleased to make against both Mr. and Mrs. Harrison are, in my judgment, not justified by the evidence when considered in all its parts.

Nor is the contention which the Chief Justice makes that Mr. Harrison is without capacity to sustain the action tenable. Even under the cold and pitiless rules of the common law, which were conceived and enforced to shield and protect the royalty and nobility of England against the consequences of their sexual derelictions, the putative **11, 12** father of an illegitimate child had rights respecting it which ordinarily were paramount to all the world except the mother. But the child in question is not an illegitimate child. It was legitimated by the acts of its parents. I am aware that the Chief Justice strenuously insists that such is not the case. But the very section he quotes refutes his conclusion. Has not Mr. Harrison met the conditions im-

posed by the statute referred to by the Chief Justice? Has he not openly and publicly acknowledged the child as his own, with the consent of the mother, who is also his wife? Did he not go to the hospital before the child was born and make arrangements for the care of Mrs. Harrison during her confinement? Did he not pay the expenses for such care? And did he not, when he met the appellants at the hospital a few weeks after the child was born, acknowledge it as his own? Did he not do so again when he demanded its custody from them? Finally, did he not, under oath, in his petition, and again in open court, claim the child as his own? If these acts do not constitute a public acknowledgment, what acts would or could do so? Suppose Mr. Harrison should die next week, or next month, or next year and leave a large fortune, would not the child in question be his legal heir under our statute? If its rights as an heir were contested, and the question were left for decision to the Chief Justice, I can even now forecast that his decision would be in favor of the child. Why is it then that, in order to condemn the father, the consequences of his shortcomings must be visited upon his wife and child? Why must this child be branded with illegitimacy when it can subserve no purpose except to denounce its parents? Yet all this, it is feelingly insisted, is to promote the best interests of the child. When the little girl in question shall grow up and shall develop into a good woman, as we all hope she may, and in her capacity as such in coming in contact with the thoughtless, cold, and pitiless decrees of society, she shall learn and appreciate the benefits of legitimacy, I wonder whether in reading the reflections of the Chief Justice, as she may do, she will meet with as much difficulty in arriving at the conclusion as I have that his observations and conclusions, however well meant, did in fact promote her best interests? Why cast doubts upon her status where none exist? This feature of the case the Chief Justice, I think without intending it, either overlooks or ignores. It is this feature that distinguishes it from the two cases heretofore decided by this court, and on which the Chief Justice relies. The

fact that children grow up to take their place in society and must ultimately assume and discharge the multifarious and responsible duties as members of society, and as citizens, impels me wherever possible to upheld their legitimacy to the end that they may shield and protect their own and their parents' good name. Nor can the shortcomings of the parent, when such is not necessary, induce me to expose their offspring to the gibes and sneers of a thoughtless world. But a conclusive answer to the last phase of the case is that no one in the court below nor in this court even mooted the question of capacity. The question at most, even though it could be raised as against Mr. Harrison, is one of capacity to maintain the action. Such a question, under our statute, must be specially raised either before or at least when pleading to the merits, and unless so raised it is waived. The question, therefore, not having been raised, I had no occasion to refer to it or to discuss it, and I have referred to it now only because the Chief Justice seems to consider it as a controlling factor in the case. In answer, therefore, to the questions of the Chief Justice, which he propounds in various forms, and the substance of which is, "what more is necessary to brand Mr. Harrison as utterly unfit to have the care, custody, and nurture of this child," I answer that the only thing that is really lacking is sufficient competent evidence to establish his unfitness.

The judgment of the district court awarding the custody of the child in question to respondent, therefore, is affirmed, with costs.

STRAUP, J.

I concur with Mr. Justice Frick. Much is said concerning the law of the case, and that the welfare of the child is of primary consideration. The doctrine, when properly understood and applied, may be conceded. The presumption is that parents are fit and suitable to be intrusted with the care and custody of their child, and that its interest and welfare are best subserved under their care and control. Before their legal right to its custody will be denied or

invaded by the court, I think it must be made to appear that they in some manner have legally surrendered or forfeited such right or abandoned the child, or are morally unfit to have its custody, or are unable to properly provide for it in their own style and station in life. So when it is said that in determining a disputed custody of a child the primary consideration is its welfare, such statement should be considered in connection with the above propositions. For I do not think any one will seriously contend that, as against a stranger, a parent's legal right to the custody of his child will be denied him where an abandonment or a forfeiture, or laches, or a legal surrender, or unfitness, or inability of the parent is not clearly shown. That is, the legal right of a fit and suitable parent to the custody of his child will not be denied him as against an opposing claimant himself without a legal right to the custody of the child, though the latter may be able to show that it is to the best interest of the child to leave it with or award it to him. If a parent merely gives the custody of his child to another and shortly thereafter—a month—demands it back, such other cannot defeat the parent's right by merely showing that he is better able to care for and rear and educate the child and give it advantages and opportunities beyond the reach of the parent. There may be instances where, looking alone to the interest of the child, its advantages and opportunities in the home of a wealthy and generous stranger of high intellectual attainments and moral worth are many times better than in the home of its parents of little education, and having only a meager income. But that is not what is meant when it is said the welfare of the child is the primary consideration. Were it otherwise, then, as the authorities say, no poor man could hope to retain the nurture, comfort, and companionship of his own child against the claim of a rich and generous neighbor who in some manner obtained its custody, and was willing to offer it a home.

Now, as between litigants both having and claiming legal rights to the custody of a child, advantages, opportunities, and influences may have considerable weight. As between

such claimants it is of primary consideration as to which of
them may likely better rear and train the child and make a
better citizen of it. But courts do not, as against a stranger
without legal rights, deny fit and suitable parents their legal
right to the custody of their child on the theory that it is
to its best welfare to leave it with the stranger because he
can better support, educate, and train it and give it advan-
tages and opportunities which the parents are unable to give.
If, now, a parent, though he has not forfeited his right nor
abandoned the child, and otherwise has a legal right to its
custody, is nevertheless morally unfit or unable to properly
support and maintain it, the best interest of the child re-
quires that it be not taken from a good home and placed in
a bad one where it will be surrounded with immoral or im-
proper influences, or where it will not be properly cared for
and maintained. If, on the other hand, the parent is
morally fit and able to properly care for the child in his own
style and station in life, and has not by abandonment, laches,
or otherwise forfeited his right, then, as against an oppos-
ing claimant without legal right to the custody of the child,
the parent's right will not be denied or invaded merely be-
cause the child may be better maintained, educated, and
trained by such opposing claimant. I cannot concur in a
doctrine that, where a parent has made an oral and volun-
tary, but revocable, surrender of his child to a mere stranger
himself, without legal right to its custody, and where there
are no laches and no new ties created or a *de facto* relation
of parent and child established between the stranger and
the child—where, as here, the child was surrendered at
birth, and its custody demanded back within a month there-
after—the parent, though fit and suitable to have and care
for it, nevertheless, to reclaim it, must show the stranger's
unfitness or inability to properly rear it, or that he is less
suitable and able than the parent. When the facts of the
cases and the underlying principle upon which they are
based, and not mere excerpts of opinions, are considered, I
think the great weight of even "modern authority" supports
the foregoing views. I do not find it supporting a doctrine

that, as against an opposing claimant, without legal right to the custody of the child, the natural or legal right of a fit and suitable parent to its custody will be invaded or denied on the mere theory that the opposing claimant may better rear and train it; and hence to leave it with or award it to such opposing claimant is to the best welfare of the child.

With these observations, I now look to the case in hand.

Here two young persons living in the country and associating together in courtship *know* each other. The usual result follows. They did not marry before the child was born, but married immediately thereafter, as soon as the mother was able to leave the hospital where the child was born. The circumstances have been fully referred to by Mr. Justice Frick. At the mother's request to give the child to some one who would give it a good home, the matron of the hospital gave it to the appellants. They are morally fit and suitable to rear the child, and are able to properly care for it. As soon as the mother was able to leave the hospital she demanded the child back. Later the petitioner also demanded it. These circumstances also have been fully related. Now, what are the legal rights of the parties?

The appellants, as I view the matter, have none whatever. The voluntary surrender which the mother made of the custody of the child was revocable, and not binding on her, and the fact that the child was born out of wedlock made no difference. Rodgers on Domestic Relations, section 564. Whatever surrender was made by her was, as the record shows, clearly revoked by her. She was not guilty of laches. No one claims that. The child was then less than a month old. New ties, surely not on the part of the child, had not yet been created, nor any *de facto* relation of parent and child yet established, between the appellants and the child. So whatever right, if any, the appellants had to the custody of the child was clearly revoked. That status could not be affected, except on the ground of laches and acquiescence after the revocation. Nothing of that kind is claimed. In this connection it is, however, urged that the demand so made by the mother could not inure to the benefit of the peti-

tioner. But whatever right the appellants acquired to the custody of the child was acquired by the voluntary surrender by her to them. Hence the same person making the surrender and the same authority by which it was made revoked it. And if the surrender at the time the demand was made was revocable, it follows that the appellants are without right to the custody of the child. Certainly no one will contend that the legal custody of a child may be bartered and transferred like chattels, in the sense that a mere voluntary surrender of its custody not founded on any legal process or proceedings of any kind is irrevocable and binding.

We then look to the legal rights of the parents. It is urged that the father, the petitioner, has none. This, on the ground that a father has no legal right to the custody of a child born out of wedlock, and that the action is alone in his name. But this is *habeas corpus,* an inquiry as to the alleged unlawful detention of the child by the appellants. Of course the inquiry is broad. But it is not like replevin where the plaintiff must recover on the strength of his own title, and not on the weakness of his adversary's. But I am satisfied the marriage, and the father by his petition publicly acknowledging the child to be his, and seeking its custody as his own, legitimated it. What more solemn public acknowledgment could be made than was here made by the father—an acknowledgment of record binding on him for all time? And then the question as to whether the mother or the father ought to have filed the petition, or that he was not the proper party to institute the inquiry, or had no legal right to assert or vindicate, was not raised in the court below nor here. That is not something which is jurisdictional, and with respect to which we may *sua sponte* open the record without regard to the wishes of the parties named on the record.

The further question, then, is as to the fitness of the petitioner to have the custody of the child, and to rear it. Of course the court will not take a child from a good home and place it in a bad one where it will be surrounded with improper or immoral influences, or where it will not be

properly cared for and supported, though the claimant may have the legal or natural right to its custody. The claimed unfitness of the petitioner is this: He and the mother of the child knew each other before marriage and failed to get married before it was born. While such conduct is not to be sanctioned or condoned, yet it does not in itself show unfitness of the parents to have the custody of their child, and to nurture and rear it. As well say for that reason they are unfit to have or rear a child born to them thereafter in lawful wedlock. I see nothing in the record to justify a conclusion that, if the custody of the child is awarded to them, they will not properly maintain or rear it. That the father knew its mother before marriage and married her not before, but shortly after, the child was born is, in itself, no proof that he will disregard his parental duties.

Then is it also said he is unfit because of the answer made by the witness Shields to questions propounded to him as to his knowledge of the petitioner's reputation for integrity and morality. There are instances where it is proper to show character of a party to the action—cases where the character of the litigant is a fact directly, not collaterally, in issue. If it is only collaterally or indirectly in issue or drawn in question, it is not at all admissible. Let it be conceded that the character of the petitioner as to morals and moral fitness was a fact directly in issue. But the admissible evidence thereof was that of general reputation as to the particular trait or traits involved. In McKelvey on Evidence (2d Ed.) p. 123, it is said:

"If the court should go into an inquiry as to the commission of some particular act on the question of character, it must, in justice to both sides, extend the inquiry to as many other acts as either side may wish to prove. In fact, a single act would be of little weight in determining character, compared to many acts extending over a considerable part of a man's life. Courts cannot go into so minute an inquiry, and therefore reject this method of proof altogether as the safer way. It is assumed that a man's course of conduct, as observed by those among whom he dwells, will give him a reputation which will fairly represent his real character, and that, in the face of the utter impracticability of the court's attempting to cover the ground adequately if it should allow proof

of this sort, general reputation will furnish the safest criterion to rely upon."

This is but a familiar rule recognized, I think, by all writers on evidence. Witnesses were called by the petitioner who testified as to his good reputation. The appellants called Shields. Their counsel, as appears in the quoted portion of the record in the dissenting opinion, had considerable difficulty in even framing a proper question. When the question was first propounded, and before answer thereto, objections were made by the respondent on the ground that the inquiry was not sufficiently directed to the question of general reputation. The court ruled with the respondent and directed that the inquiry should be so restricted. Then appellants' counsel added to the question, "I mean his general reputation." The witness answered, "Not a very good one as far as I am concerned." Then counsel for appellants: "You say so far as you are concerned? A. No, sir; he has put me to a lot of trouble and expense. Q. In what respect? A. Well, I had a daughter had a child by him." This was all in clear violation of the just prior announced ruling of the court made on respondent's objection. When a party once makes a specific objection to a particular thing and receives a ruling, whether in his favor or against him, he is not required to keep on objecting to the same thing, especially when the case is before the court without a jury. But after the answer, "I had a daughter had a child by him," respondent's counsel again immediately objected. The court promptly sustained the objection. Now it is said this statement of the witness is in because no motion was made to strike it. But the ruling of the court was tantamount to striking it. It is not like a matter where an objection is overruled because it came too late. No claim is here made that the objection was not in time, and the court, regardless of order, promptly sustained it. The court by that ruling clearly denied appellants the benefit of that testimony. Their counsel so regarded it by excepting to the ruling and saving an exception. If I do not give the ruling

that effect, I give it no effect. Hence, I say, the ruling was tantamount to striking the testimony. Then appellants' counsel again tried to qualify the witness by asking him:

"You say you know his general reputation? A. Yes, sir; in that respect. Q. Well, now, just explain to the court in what respect you mean."

An objection to that was again sustained· on the same ground, that the inquiry was not directed to general reputation. And when the court finally told counsel that he was required to first ask the witness if he knew the general reputation of the petitioner, and, if he answered in the affirmative, then to ask him what that reputation is, good or bad, counsel for appellants acquiesced in the ruling by replying, "Your honor is correct on that point," and, without any further attempt, abandoned the whole matter and withdrew the question. Now, what is elicited by all this? Nothing. All appellants did was this: They called a witness as to the petitioner's reputation, and, failing upon repeated attempts to qualify him, withdrew him; and now they urge that answers made by him on *voir dire,* preliminary testimony merely relating to his competency to testify, be regarded as evidence concerning a fact in issue, but concerning which he did not testify because he did not qualify. I do not think we may so regard it. It, however, is said it would have been competent to show habits of the petitioner as to inebriety, temperament, disposition, neglect, mistreatment, etc., and for that reason the answer in or out should be considered by us. The answer does not show, nor did appellants attempt to prove, anything of that kind. The answer, "I had a daughter had a child by him," relates not to habits or disposition, but to some specific act, to particular conduct, and hence was not admissible either as character evidence or to show habits or disposition, though it had been made on the issue, and not merely on *voir dire.*

It is also urged that the child was abandoned by its parents, and for that reason have they forfeited their right to its custody, and are unfit to now have and rear it. The facts as to that have also been referred to. To me they show

a voluntary, but revocable, surrender of the custody of the
child, but not an abandonment. I do not think that a mother
who, under the circumstances disclosed by the record, makes
arrangements with the matron of a hospital to place her
child in a good home where it will be cared for shows an
abandonment, but a voluntary and revocable surrender of
its custody. I see no element of abandonment in it. I find
nothing in the record to justify the conclusion that the
petitioner and his wife are morally unfit to have the custody
of the child, and to rear it. As has been suggested, no one
has the same interest in a child as have the natural parents,
and experience teaches that it is far better to let it grow up
with them, so long as they are morally fit to have its custody.
That the parents here are able to properly provide for and
support the child is not disputed. They are shown to have
as much ability as have the appellants. The latter, though
morally fit and competent to rear the child, nevertheless
possess no unusual or exceptional moral or intellectual worth
or fitness. Their style and station in life is similar to that
of the respondent. If the child is left with the appellants,
I doubt not that they will properly rear it; but since they
have shown no legal right whatever to its custody, the parents
a clear legal right, and that they have not forfeited that
right nor abandoned the child, and are themselves morally
fit, I see no reason to interfere with the judgment of the
court below.

Nor do I see wherein such a conclusion is in conflict with
the prior decisions of this court. In neither the prevail-
ing nor the dissenting opinion is any principle of law an-
nounced which is in conflict with the Gray or Hummel
Case. The disagreement arises upon facts and conclusions
of fact, not law. Both the prevailing and dissenting opin-
ions treat the case from the same legal viewpoint, but differ
materially from viewpoints of fact and conclusions of fact.
Both proceed on the theory as announced in the prior cases
that the primary consideration is the welfare of the child;
but the one, on a review of the facts, reaches the conclusion
that that interest is best subserved with the parents, the other

with the appellants. In that I concur with Mr. Justice
Frick.

McCARTY, C. J.

I dissent. The evidence, without conflict, shows that the
mother of the child in question decided before it was born
to give it away. The undisputed evidence also shows that
the then putative father of the child, respondent herein,
knew that it was the intention of the mother to give the child
away, and that he made no objections thereto either before
or after the birth of the child. Mrs. Phillips, the matron of
the hospital where the child was born, testified in part as
follows:

"Q. Did you have any conversation with Mrs. Harrison
as to the disposition of the baby before its birth? A. Yes,
sir; she said the baby was to be given away; that she wanted
that I find a home for the baby; that she could not keep it.
I asked her to keep the baby. I wanted her to keep the
baby. She desired that I should put the baby in another
room. She said she didn't want to see it. She said that
before the baby was born. After the baby was born I placed
it in another room. . . . I did this at her request. Q.
Did you talk to her at all about keeping the baby? A. I
did. I spoke to her in regard to keeping the baby before the
baby was born. I said this to her: 'Keep your baby, yes,
keep it. If you give your baby away, you will shed tears
and tears over the baby, and your heart will ache and call
for the baby.' It was my desire that she keep it. . . .
She said she wanted it given away. . . . Q. When
Mrs. Harker came, state what, if anything, you did with
the baby before giving it to Mrs. Harker. A. I went into
Mrs. Harrison's room and asked her if she would not like
to see the baby before it was given away. She said yes she
would, and I carried the baby in and placed it in her arms.
. . . She held it close to her breast and kissed it.
. . . After she held it for a few minutes she opened her
arms and said, 'Here.'"

Mrs. Harrison, the mother of the child, testified on this point as follows:

"Q. Do you remember telling the nurse before the child was born that you didn't want to see it? A. I don't remember. Q. You may have said that? A. I don't remember. I did not tell Mrs. Phillips to take the child in another room so I could not see it. I could not rest, and she took it into another room so I could rest. Q. You did know, Mrs. Harrison, that the child would be given away when you went to the hospital. You did know that, didn't you? A. Yes, sir. Q. And you went there because you knew it would be given away, and you would conceal what you and your husband had done. . . . You knew that was the best way to conceal it, didn't you? A. Well, yes; I guess I did."

Mrs. Harrison further testified:

"I let the child go because I did not like my father to hear about it. My folks did not hear anything about it, and I was going to keep it quiet. Q. Were there any objections when the child was given away? A. No, sir."

Mr. Harrison, the respondent, on cross-examination, testified:

"Q. Did you know that your wife was going to give away the baby when she went to the hospital? A. That is what she said. . . . I thought she was. That is what she said. Q. Did you tell her not to? A. No, sir."

It will thus be seen that Mrs. Harrison, of her own volition, and with the consent and approval of the child's then putative father, voluntarily relinquished her right to the care, custody, and control of the child, with the intention, deliberately formed on her part, of never reclaiming it from the parties into whose custody it was placed, and in pursuance of an arrangement she had made with Mrs. Phillips before the child was born.

The court, among other things, found:

"That at the time the said Ella Harrison instructed said Mrs. Phillips to 'give' said child away, she was, to a cer-

tain degree, under the influence of an anæsthetic adminis-
tered to her at the time of her confinement."

I respectfully submit that there is not a scintilla of evi-
dence in the record that supports, or tends in the remotest
degree to support, that finding. On the contrary, the evi-
dence without conflict shows that Mrs. Harrison was not
in any degree under the influence of an anæsthetic at the
time she requested Mrs. Phillips "to give the child to some
responsible person" as found by the court. Mrs. Harrison,
on direct examination, in answer to a question propounded
by counsel for respondent stated:

"She (Mrs. Phillips) knew what I went there for. She
knew, of course—I knew, of course, the child would be
given away. Yes; I knew it would be given away."

The record shows that both Mr. and Mrs. Harker are
thirty-six years of age; that they, financially, are well to
do people. Mr. Harker's testimony as to this, which is not
disputed, is:

"I reside at Taylorsville (Utah). I have lived there about
thirty-six years. I own my home. I own land of my own.
My principal business is dairying. I own my own stock and
cows. My income from my dairy business and farm, I
should judge, will average the year round fifty-five dollars
a month clear, aside from what we consume."

No claim is made that the Harkers are not fit and proper
persons to have the care and custody of the child. In fact,
I do not think that any person can read the record in this
case without being impressed, if not convinced, that they
are honest, truthful, moral, frugal, industrious, and thrifty
people, and in every respect model citizens. Last, but not
least, the record shows affirmatively that they are kind-
hearted and sympathetic, and that they are very much
attached to the child. They received the child and took it
into their home about nine or ten hours after it was born.
The next day they discovered that the child's eyes were
sorely afflicted. This affliction lasted about ten weeks, dur-
ing which time the child was nearly blind. They employed

44 Utah 37

a physician to treat the child's eyes. They also procured the
services of a trained nurse to help take care of the child
during the first ten days of its illness. Later on the child
came down with the measles, and they again secured the
services of a doctor, who prescribed for and gave it medical
attention during its illness. Immediately on taking the child
to their home they consulted the board of health and a doctor
as to the kind of food or diet that would be suitable for the
infant. Mr. Harker testified regarding the watchful care
they gave, and are still giving, the child, as follows:

"We have nursed the child night and day, tried to do
our best for it, and gave the little thing the best we had.
We had to feed it first regularly about every two hours night
and day; now we are feeding it on retiring about seven
o'clock, and then we feed it twice in the night and the first
thing in the morning."

Further:

"If we have the luck to keep the child and raise it, it
is my intention that it shall share equal—if we have good
fortune enough to have other children, it shall share equal,
and, if we do not have any others, the child shall fall heir
to all I have."

Mrs. Harker's testimony regarding the child's illness and
the care and attention given it was substantially the same as
that given by her husband. She further testified:

"I have been a nurse ever since I was fourteen years of
age. Nursing has been my occupation—taking care of new-
born babies and nursing them. Q. If you are allowed to
keep the child, is it your desire and feeling that you main-
tain, support, and take care of the child? A. Yes; to the
best of my ability. Q. To educate it? A. Yes. Q. And
will it share in your property the same as your own child?
A. Yes; that is what we got it for. Yes, sir; there is no
hope of any family. That is what we got it for."

On reviewing the evidence bearing upon the general char-
acter of Mr. Harrison, respondent herein, and his conduct
towards and treatment of the child and its mother, I shall
refer to the different incidents, facts, and events relating

thereto in the chronological order in which they occurred, rather than the order in which they were presented to the trial court. It developed at the trial that Mr. Harrison. respondent herein, is the father of at least one other child born out of wedlock. It is held in the prevailing opinion, written by Mr. Justice Frick: (1) That the evidence introduced establishing this fact was incompetent; (2) that the evidence, under the rulings of the court, was excluded; and (3) that the question in response to which the evidence establishing the fact was given was withdrawn by counsel who propounded the question. I cannot agree with my Brethren as to either of these propositions. Since our views regarding this point in the case are so much at variance, I herewith insert in substance the testimony as given by the witness, the remarks of counsel, and the rulings of the court as contained in the bill of exceptions. After the witness had given his name as David A. Shields, and testified that he is forty-eight years old, has lived in South Jordan, Utah, all his life, is and has been for fifteen years acquainted with respondent, and that his farm adjoins that of Mr. Harrison, the boundary line between them being the Jordan river, the record continues:

"Q. Have you been in more or less close communication with him during the time you have known him? A. Well, no sir; don't have very much with him, only just as a neighbor. That is all. Q. Do you know what his reputation is as far as integrity and morality?

"Counsel for respondent: I object to the question as not being proper, not being in the proper form.

"The Court: Well, it is not if he has completed the question. Of course he should limit it to some locality and not leave that up in the air.

"Counsel for appellant: I will limit it to the locality in which he lives.

"Counsel for respondent: If I may suggest, you can only inquire; if I understand the law, as to the general reputation, which you did not do.

"The Court: That is correct. It should cover his general reputation.

"Counsel for appellant: I mean his general reputation.

"The Witness: Well, not a very good one, as far as I am concerned.

"Q. You say, as far as you are concerned? A. No, sir; he has put me to a lot of trouble and expense. Q. In what respect? A. Well, I had a daughter had a child by him.

"Counsel for respondent: Object to this examination as immaterial, irrelevant, and incompetent.

"The Court: Sustained.

"Counsel for appellant: Exception.

"Q. You say you know his general reputation? A. Yes, sir; in that respect. Q. Well, now just explain to the court in what respect you mean.

"Counsel for respondent: We object to that last question as calling for particular circumstances, and counsel has no right only to examine as to his general reputation.

"The Court: You are correct. In the first instance that is what the question should be limited to. . . . I think you are limited to the general reputation.

"Q. I will ask you, Mr. Shields, to explain what you know of his general reputation.

"The Court (addressing counsel): Now, Mr. Stokes, I think the question should be limited to whether this witness knows the general reputation in the community, and as to that, if he answers yes, you could ask whether it is good or bad. I think that is the extent of your direct examination. . . .

"Counsel for appellant: I will withdraw the question. I think your honor is correct on that point."

It will be noticed that no objection was made to the answer of Shields to the question, "Do you know his general reputation in the locality where he lives for integrity and morality?" on the ground that the answer was not responsive to the question. The two questions following the one just mentioned indicated that improper testimony as to

reputation would be elicited from the witness; but counsel for respondent, nevertheless, remained silent and made no objections until after the questions were answered. Nor did he request the court to strike out this damaging evidence to his client. It will also be noticed that the question withdrawn by counsel for appellants was the one twice propounded to the witness after the testimony in question was given. The evidence that he is the father of another illegitimate child whom he had neglected and left for others to support is therefore in the record and before this court for consideration in connection with other evidence in the case. Jones on Evidence, section 898. In this class of cases, the interest of the child being of controlling importance, great latitude is allowed in the introduction of evidence.

"The court is not restricted to ordinary methods of trial, or bound down by any particular form of proceedings." 29 Cyc. 1604.

Where a mother gives away her illegitimate child, with the approval of the child's father, a few hours after it is born, as was done by Mrs. Harrison in the case at bar, and the child is thereby in effect cast off and abandoned by its parents, and other parties receive the child, with the intention of adopting and rearing it as their own, care for and nurse it for nine months, and the father then by legal proceedings seeks to recover possession of the child, the inquiry is not confined to the question of whether the father is able to care for and support the child, and is a proper person to have the care and custody of it. In such case the primary, important, vital, and controlling question is: Would the social, moral, physical, and educational training of the child be best promoted by leaving it with its foster parents, or by giving it into the custody of its natural parents? (*Stanford v. Gray*, 42 Utah, 228, 129 Pac. 423; *Hummel v. Parrish*, 43 Utah, 373, 134 Pac. 898; *Ex parte Swall* (Nev.) 134 Pac. 96; *Nugent v. Powell*, 4 Wyo. 173, 33 Pac. 23, 20 L. R. A. 199, 62 Am. St. Rep. 17; 2 Bish. Mar. Div. & Sep. 1171.)

In the case of *Schneider v. Schwabe,* recently decided by
the Texas Court of Civil Appeals, 143 S. W. 265, the court
said:

"While recognizing the natural right that parents have to their
custody of their children, the *children have rights that are higher
and of more importance to state and society than the naked right
of parents to their custody.* . . . No sentimentality should at-
tend a proceeding of this character; but the permanent interest
and welfare of the child should be the great aim and end to be
attained." (Italics mine.)

In determining this question, the court will consider the
habits and disposition of the parties to the action, the
affection or lack of affection they, or either of them, have
shown for the child, the care and treatment it has received
in the past and would likely receive in the future at their
hands, the social and moral influences with which the child
is and has been surrounded in its present home, and what
those influences would likely be in case it should be given
to its natural parent. The moral character of the parties
may also be shown, and, in proving character in this class of
cases, the evidence is not necessarily confined to general
reputation for morality or immorality as the case may be.
Evidence of particular acts showing moral turpitude is ad-
missible. In *Bonney v. Bonney* (Ky.) 9 S. W. 404, the
court, in taking a little child from the custody of the father
and giving it into the custody of the mother, based the order
or judgment on one particular act of "grossly immoral and
indecent conduct on the streets" by the father. (*Garner v.
Gordon,* 41 Ind. 92.) If Harrison on another occasion had
wronged, debauched, and ruined an innocent, trusting girl,
and as a result of his illicit criminal relations with her a
child was born out of wedlock, which he has failed to care
for and support, or to contribute to its support—and the
record as it now stands shows such to be the case—under
what rule of law can it be successfully urged that this trans-
action, in which is blended the breach of a high moral duty
and the infraction of a penal statute, may not be shown by
evidence and be considered by the court for the purpose of

establishing and determining the kind and character of a man he is? Putting the proposition in another form: Under what principle of justice, rule of equity, law, or procedure, may he, in a proceeding of this kind, where his character and manhood are vital issues, claim the right to have these moral delinquencies suppressed and withheld from the court—breaches of moral and legal duty, which I contend are the very best kind of evidence of his character viewed from the standpoint of morals? It must be conceded that if he were the father of a child born in lawful wedlock, whom he had cast away and abandoned, as he did the child in controversy, and had failed to provide or secure it a home, had failed to support or to contribute to its support, evidence of such breach of moral and legal duty would be admissible. Such evidence would have a direct bearing on the question of whether it would be to the interest of the child's parent and future welfare to take it from under the kind and loving care of the Harkers, where it is surrounded with congenial family influences so necessary to its social, moral, and intellectual training, and give it into the custody of the respondent, who had been thus derelict in his duty to his other child. His moral duty to provide for the support of his illegitimate child, and to see that it is provided with a home, properly reared, and educated, is just as great as it would be if the child had been born in lawful wedlock. This being so, how can it be consistently held that evidence of his derelictions of duty to his illegitimate child is not admissible as evidence, but, if the child had been born in lawful wedlock, such evidence would be admissible? To illustrate: Suppose that in a controversy of this kind the natural parent should be addicted to the excessive use of narcotics, and should be what is commonly called a "dope fiend," or that he is the father of other children whom he has willfully neglected to provide with the common necessaries of life, or that he has a violent and uncontrollable temper, and has on numerous occasions cruelly and brutally beaten and otherwise illtreated his children; may not these facts be shown by direct evidence? First,

that he is addicted to the use of drugs; second, that he has willfully neglected to provide his children with the common necessaries of life; and, third, that he has on numerous occasions cruelly and brutally beaten and otherwise illtreated them. Such evidence would be admissible, as it would have a direct bearing on the question of whether the parent is a fit or unfit person to have the custody of his child. And I venture the statement that there is not a well-considered decision that holds to the contrary. The evidence of Shields was therefore admissible for the purpose of showing that respondent is the father of another illegitimate child whom he has deserted and abandoned. In his supplemental opinion Mr. Justice Frick observes that:

"When it is sought to prove a habit, such as drunkenness, the courts, of course, permit evidence of individual instances, since that is practically the only way the habit may be shown."

If this is sound doctrine, and it must be conceded that it is, then why may it not be shown, in a case of this kind, where a parent seeks to recover his illegitimate child whom he has deserted and abandoned, that he is the father of another illegitimate child whom he has also deserted and abandoned, by direct evidence of the fact? It is the only way it can be proved. I recognize the general rule that, where the character of a party to an action is collaterally put in issue, specific acts or omissions bearing upon the question of character are not admissible; but in cases of this kind, where the character of the parties to the action is one of the vital or main issues in the case, a more liberal rule obtains as to the introduction of evidence.

It is stated in the prevailing opinion that I base my "conclusion that Mr. Harrison is an unfit person to have the custody and control of his child upon one statement made by the witness Shields." This is an error. How it is possible for a person to read my opinion and arrive at any such conclusion is to me incomprehensible. What I do say is, that the evidence of Shields was neither withdrawn nor stricken, and hence is before this court, and may be con-

sidered in connection with other evidence in determining whether it would be for the best interest of the child to remain with its foster parents or be given to respondent. It, however, is not a vital element in the case. It neither adds to nor detracts from the perfidy of respondent in his conduct towards and his treatment of the child in permitting it to be born out of wedlock and then willfully neglecting and abandoning it.

Assuming for the sake of the argument—but not conceding—that the evidence of Shields was incompetent and inadmissible for any purpose, and that it should not be considered, yet the evidence shows that respondent is woefully lacking in moral fiber. His conduct towards and neglect of his wife from the time he learned of her delicate condition, caused by his illicit criminal relations with her until they were married, were so dishonest and reprehensible, and his conduct towards the child in casting it away and in effect abandoning it when it was born, and his indifference to and coldness for it ever since, shows that, if he is not wholly unfit to have the care and custody of it, at least that it would be for the best interest of the child for it to remain with the Harkers, and especially so when considered with the other evidence in the case. As an excuse for his failure to atone, so far as it lay in his power, to Mrs. Harrison for the irreparable wrong he did her before they were married, when he learned of her delicate condition, which was, so he testified, "quite a few months before" the child was born, he said:

"I had offered to marry Mrs. Harrison before the child was born. I permitted this arrangement to protect her own reputation with her own folks. I worried about it."

These statements were made on his redirect examination, and they were all suggested by the questions asked him by his counsel. The record all but conclusively shows that his statement that he offered to marry Mrs. Harrison before the child was born was an afterthought suggested by his counsel, and that he never made any such offer. Before he made the statement he testified as follows:

"Q. Now tell the court whether or not there was anything in the way of your getting married before the child was born? A. No, sir; not a thing. Q. Not a solitary thing? A. There was nothing to stop my getting married, except she said to keep it from her father, nothing in the world."

I will here observe, parenthetically, that this is evidently the testimony upon which the statement made in the prevailing opinion that "prior to July, 1911, the respondent and Ella, his wife, were lovers and engaged to be married" is based, because it is the only evidence in the record on the question of their intention or lack of intention to get married before the child was born, except the emphatic denials made by Mrs. Harrison that before the child was born they had no intention of getting married. Mrs. Harrison, in giving her testimony, said:

"Q. He (respondent) knew your condition before you went there (to the hospital) . . . knew it some months prior to that time, didn't he? A. Yes, sir. Q. And you and he talked the matter over about concealing it, didn't you? A. No, sir; we didn't. Q. You never talked it over? A. No, sir; we didn't. Q. He could have married you before that time and took care of the child, couldn't he? A. Yes. Q. There is no reason in the world why he should not have done that, is there, Mrs. Harrison? A. I think not."

This evidence alone is sufficient to brand respondent's statement that he offered to marry Mrs. Harrison before the child was born as a falsehood. Mrs. Harrison, in giving her testimony, said that her object in going to this private hospital, and in giving her child away immediately after it was born, was to "keep it quiet" and thereby prevent her father from learning of her shame; but nowhere in her testimony can be found an expression that suggests, or even hints, that Harrison offered to marry her, or that she objected to him marrying her, or that the subject was ever mentioned by either of them before the child was born. The claim made by respondent that he did not marry the girl when he learned

of her delicate condition, and took no steps and made no effort to protect and to provide for the child when it was born, was because he wanted to keep the fact of its birth from her father, is so puerile and, as this record shows, basely false that I would not give the matter further consideration, were it not that it is referred to in the prevailing opinion, and there apparently given some weight. The fact is he neither desired nor intended to marry the girl. These parties were twenty-four years of age. The girl had left her father's home and was living with her aunt, presumably supporting herself. There was therefore no legal impediment whatever preventing him from marrying the girl either before or after he accomplished her ruin. While Mrs. Harrison testified that it was not their intention "to be married before the child was born," she nevertheless testified that "he could have married me before that and taken care of the child." And, again, that there was "no reason in the world why he should not have done that." That the girl's father was not even a silent factor in these transactions, and that Harrison, because of him, was not in the remotest degree influenced in his despicable conduct toward the girl and her child, I think, is too plain to admit of serious discussion. He knew that he had violated a penal statute of this state, and he no doubt fully realized that if his offense became known the matter would be investigated, and he probably would either be compelled to marry the girl or suffer imprisonment, hence his "worry." I think the conclusion is also irresistible that, if it were not for the interest that the girl's aunt, Mrs. Silcocks, took in her welfare, respondent would never have taken any steps or made any move to atone to the girl for the great wrong he had done her. It was the aunt, not the parent, who went with the girl to the home of the Harkers three weeks after the child was given away and induced her to demand of them the return of the child. From the Harkers she went with the girl to see respondent. I think it may be fairly said that it was because of what occurred between Mrs. Silcocks and Harrison on that occasion that induced, or rather forced, him to marry

the girl, which he did in less than a week thereafter. It seems that in all of these transactions the girl's father was entirely ignored. In fact, I think the record justifies the conclusion that the only interest respondent has ever had or shown in his wife's father was to use his name in formulating excuses for his perfidy to the child and to Mrs. Harrison before the marriage took place. On cross-examination respondent testified:

"Q. Did you ever talk to her father? A. No, sir. Q. Never had a word with him? A. I just met him is all. . . . Q. You never had any conversation with the father at all? A. No, sir. Q. You don't know whether he would or would not object to your marrying the girl? A. I don't know whether he would or not."

It thus appears that, in matters usually of the greatest importance to a parent who has a daughter about to enter the marriage relation, respondent showed less respect, courtesy, and regard for the girl's father than one neighbor would ordinarily show to another in the common everyday affairs of life. Moreover, the marriage was not entered into by him because of any desire on his part to legitimate the child and then later on recover possession of it. Mrs. Harrison, on direct examination, was asked the following question by respondent's counsel: "You may state if it was your intention to get the child at the time you were married." And she answered, "I cannot answer that." A few days after he and Mrs. Harrison were married respondent met the Harkers at the hospital where the child was born. Mrs. Phillips, a disinterested witness, testified that on that occasion Harrison stated to the Harkers that "he didn't want the baby, neither did his wife want it." Both Mr. and Mrs. Harker testified to the same thing. Harrison denied making any such a statement. He admitted, however, that he made no demand on them for the child. He also admitted that he stated to the Harkers that he did not want Mrs. Silcocks to have the care and custody of the child. He further admitted that he made no demand on the Harkers for the return of the child until ten months after

it was given away. I submit that taking into consideration the character of the witnesses and their manner of testifying, as shown by the record, the great preponderance, in fact the overwhelming weight, of the evidence shows respondent made the statements attributed to him by Mrs. Phillips and the Harkers. Moreover, his neglect of the child and his cold indifference to its welfare from the time it was born until the trial of the case, I think, conclusively shows that he has no love or affection whatever for it. Mrs. Harrison informed him three days after the child was born that it had been given to parties residing in Taylorsville, and he did not care enough about the child to even inquire who the parties were. Three weeks later he learned that the child had been given to the Harkers, and that it was afflicted with sore eyes; but he never called to see it, and there is not a scintilla of evidence in the record that indicates that he ever made any inquiry about it. In fact it appears that when he and Mrs. Harrison were married, and he no longer was in danger of being criminally prosecuted, he ceased "worrying" about her and the child.

It is suggested that when the judgment of the trial court goes into effect, and the child is taken to the home of the Harrisons, its mother will give it the proper care and attention and surround it with wholesome moral influences, educate and bring it up as children should be reared and educated, and that its environments and the influences surrounding it will be as elevating, if not more so, than those with which it is now surrounded. I respectfully submit that this record does not justify any such conclusion.

It is said in the prevailing opinion that prior to the birth of the child respondent and Mrs. Harrison "were lovers and engaged to be married." As I read the record there is absolutely no evidence whatever showing, or tending to show, that they were engaged to be married before the child was born. And I submit that the evidence does not justify even an inference that they were in love with each other. Mrs. Harrison, on direct examination, testified concerning the

understanding, or rather lack of understanding, between her and respondent about getting married as follows:

"Q. You may state whether it was your intention to be married before the child was born? A. No, sir; it was not."

And again, on cross-examination, she said:

"It was not our intention to get married before the child was born."

Assuming for the sake of argument that they were, prior to the birth of the child, in love with each other and engaged to be married, their failure to get married, and permitting the child to be born out of wedlock, the giving of it away, and sending it out into the world a nameless waif, their lack of interest in the child and its welfare, and their indifference to its fate for nearly a year thereafter, were unnatural. Their conduct in that regard was contrary to the natural emotions, impulses, instincts, attributes, and sense of right of parents who have any affection whatever for each other, or for their offspring, and who have any conception or regard for the moral obligations they are under to shield, properly care for, and support their helpless children. It is evident, regardless of whether they were sweethearts and engaged to be married or not, that Mrs. Harrison is a woman of weak moral convictions, and that she is deficient in the natural instincts and attributes of her sex that exalt and sanctify motherhood. Otherwise she would not, without protest, have consented that the child be born out of wedlock. Nor could she, in the presence of the infant, and in face of the kind, persuasive, urgent, and forceful appeals made to her by the nurse, Mrs. Phillips, to keep the baby, have given it away, which she did apparently without any feeling or remorse, and with less regret than a young woman would have given away a pet animal to which she had become attached. While Mrs. Harrison is to be pitied more than blamed for her weakness and indiscretions, yet I cannot permit sympathy and compassion for her to sway or warp my judgment to the prejudice of the legal and equitable rights of the child. In its present home the child, a girl, will be

under the constant, watchful, tender, and loving care of Mrs. Harker, the only mother it has ever known. And I think that this record shows, tested by the love and affection now being bestowed upon the child as compared to what it will receive in the home of the Harrisons, Mrs. Harker is the only real mother it will ever know. The record shows, so far as it is possible for a record to reflect the intelligence, refinement, and general disposition and character of a person, that Mrs. Harker is a woman of high ideals, refined, kind-hearted, sympathetic, and a lady in all that the term implies. In fact, the only conclusion permissible from the record is that she is an exemplary woman in every respect.

The effects of environment even on a woman of strong character and high ideals, situated as Mrs. Harrison is, are well illustrated by the following lines:

"As the husband is, the wife is. Thou art mated with a clown,
And the grossness of his nature will have weight to drag you down.
"He will hold thee, when his passion shall have spent its novel force,
Something better than his dog, a little dearer than his horse."

The record in this case shows that the respondent, in the affection and consideration, or rather lack of both, which he has shown for his wife and child, falls far below the standard of the coarse dominant character so graphically portrayed in the foregoing couplets. The evidence clearly shows that respondent has exhibited less concern and solicitude for his wife and child than men ordinary do for pet animals. I think the presumption may be safely indulged that he would not have neglected a valuable horse that needed care and attention as he neglected the woman he so grievously wronged, and that he would not have given away and abandoned any kind of a domestic animal of value as he gave away and abandoned his child. In the treatment of his wife before he married her, and by his willful neglect and abandonment of the child from the time it was born until he made a demand on the Harkers for its return ten months thereafter, he showed a ruthless disregard and con-

tempt for the moral law, both human and divine, that bordered on degeneracy.

"But if any provide not for his own, and especially for those of his own house, he hath denied the faith and is worse than an infidel." 1 Tim. v, 8.

Respondent not only failed to provide "for his own" offspring, but declines to compensate the Harkers for the expense and trouble they have been put to in caring for and nursing the child. I shall pass by the seventh commandment and the numerous expressions in holy writ in which a kindred offense is condemned and denounced, because I am assuming, *but not for one moment conceding,* that in all cases of this kind evidence of the breaking of the seventh commandment and commission of like or kindred offenses condemned by holy writ and denounced as crimes by our Penal Code is incompetent and inadmissible to prove moral character even where, as in this case, an illegitimate child is born and then deserted and abandoned by its parent.

It is suggested that the demand made by Mrs. Harrison three weeks after the child was given away and in effect abandoned was a revocation of the gift, and that it was the legal duty of the Harkers to deliver the child to her. Later on I shall refer to the circumstances and conditions under which the demand was made, and point out wherein I think the Harkers were legally and morally justified in refusing to give up the child. For the present I shall assume, for the sake of argument only, that the demand made by Mrs. Harrison for the possession of the child revoked the gift, and that she was legally entitled to have it returned to her. The refusal of the Harkers to deliver the child to its mother was not a wrong committed against respondent. The demand was not made at his request, with his knowledge, in his name, or in his behalf. Mrs. Harrison testified:

"We were not married at this time. I had not seen him since I left the hospital. I had not consulted with him about getting the child."

Respondent also testified to the same thing. He had done nothing to legitimate the child. Nor had he done or said anything that indicated or suggested that he intended to adopt it. Therefore he was neither morally nor legally entitled to the custody of the child. (Sections 4 and 10, tit. 2, C. L. 1907; 2 Bishop, Mar. Div. & Sep. section 1172.) Moreover, there is no allegation in the complaint that the action is brought for or in behalf of Mrs. Harrison. She is not, therefore, in a legal sense, either directly or indirectly a party to the action; hence respondent cannot predicate any legal or equitable right upon the demand made by her. Further along in the opinion I shall again refer to respondent's claim of right to the custody of the child and point out wherein he cannot, in view of the admitted facts, maintain this action under either the statutes or the common law. Respondent, a few days after he and Mrs. Harrison were married, met the Harkers at the hospital in which the child was born and engaged in a friendly conversation about the child. On that occasion he made no demand for the return of the child, nor did he even suggest to the Harkers that he desired them to give it up. But, on the contrary, as I have hereinbefore stated, the overwhelming weight of the evidence is that he there told the Harkers that neither he nor his wife wanted the child. On cross-examination respondent testified:

"Q. Did you ask them for the child at that time? A. No, sir. Q. Did you say anything to them at that time about adoption papers? A. They said they had seen John M. Cannon (attorney at law), and they were going to have papers fixed up; they were going to sign them. Q. What did you say? A. I don't remember saying anything to them. Don't remember saying anything to them."

The evidence shows, in fact it is conceded, that Mrs. Harrison went to the hospital July 16, 1911, and that the child was born the following day; that she was in the hospital three weeks only, and from the hospital she went to the home of her aunt. In other words, she went to live with her

44 Utah 38

aunt about August 5th. She and respondent were married August 17, 1911; the marriage taking place in the city and county building of this city. It seems that the bride's father was not present. In fact the record affirmatively shows that respondent did not consult him at all about the matter, notwithstanding he claims that it was because of the great respect that he and his wife had for the feelings of her father that caused him to permit the child to be born out of wedlock, given away, and in effect abandoned by its mother. I have again referred to this phase of the case because it all but conclusively shows that the excuse he gives for not marrying the girl in time to protect both her and the child is a silly subterfuge.

Mrs. Harrison took sick in September. During her illness she remained with and was cared for by her aunt. In October she became convalescent, "was able to be up and around," left the home of her aunt and went to Crescent, where she and respondent began "keeping house." I refer to these facts because they completely refute the claim made by respondent that the bringing of the action was delayed on account of Mrs. Harrison's ill health.

Reference is made to the stern and harsh manner in which Mrs. Harrison, in her testimony, claims Mr. Harker received and treated her when she, in company with her aunt, Mrs. Silcocks, called at the Harker home and demanded the return of the child to her about four weeks after it was born. Mrs. Harrison, on her direct examination, testified as to what Mr. Harker said to her on that occasion as follows:

"He would not talk to me civilly. He told me I would not get the child; could not have it. Said I was not entitled to it, and should not have it."

On cross-examination she said Mr. Harker "talked to me cross and crabbed, insulting me."

Mrs. Silcocks testified concerning what Mr. Harrison said as follows:

"Q. Can you state what the conversation was? A. . . . He said she could not have it, . . . she wasn't able to take care of it. Q. Did she say at that time anything about who

the child was—who its parents were? A. Well, not exactly. He said that she should not have the baby; she wasn't a fit mother for it. This is in substance about all that was said at that time."

Of course Mrs. Harrison was entitled to courteous and civil treatment, and that Mr. Harker should have accorded her such treatment no one will deny or even question. In view of the facts and circumstances under which the foregoing statements were made, can it be said that they amount to such a breach of decorum on the part of Mr. Harker and are of such a serious character as to indicate that he is not a proper person to have, in connection with his wife, the care and custody of the child? It is apparent that it was because of the interest he had in the child rather than any ill will towards Mrs. Harrison that caused him to be emphatic and stern in this matter. The reasons he gave for not complying with her demand for the child, namely, that "she was not able to take care of it," and that "she wasn't a fit mother for it," were about the only legal reasons he could give. Mr. Harker testified that he asked Mrs. Harrison the following question: "Why didn't you do the right thing and go and get married before that child was born?" and that she did not answer or attempt to answer the question. This was a pertinent and proper question. Mr. Harker was, under the circumstances, entitled to know whether she willingly or unwillingly permitted the child to be born out of wedlock. If it were her desire to get married before the child was born, but was prevented from so doing because of respondent's refusal to enter the marriage relation with her, something might be said in extenuation of her conduct in giving away and abandoning the child. It may be fairly inferred from the admitted facts in the case that the principal reason why these parties did not get married in time to legitimate the child was that neither of them was willing to assume the cares, duties, and responsibilities of the marriage relation, hence Mrs. Harrison's failure to answer the question propounded to her by Mr. Harker. It is admitted that Mrs. Harrison gave the child away a few

hours after it was born to prevent the illicit and unlawful relations that had existed between herself and respondent from becoming known to others. And she did this with at least the tacit acquiescence and approval of respondent. These facts alone ought to be sufficient to bar forever both respondent and Mrs. Harrison from getting possession of the child. What assurance have we that they would not again desert and abandon the child if at any time they should be of the opinion that it would be to their personal interests to do so? Certainly this record furnishes none.

Respondent testified that, when he made his last visit to the Harkers and demanded from them the custody of the child, he stated to Mr. Harker, "I thought I would be a man and come and tell you that we are going to proceed and see if we could not get the child." Mr. Harker testified concerning that interview as follows:

"I said: 'Mr. Harrison, it was an understood thing when you went to that hospital that the child was to be given away, and you didn't care whether it got a home or lived or died, or what became of it, so long as it covered up your crime.' And he said: 'No, sir; I didn't. But I have changed my mind now. I will show you I am white.'"

Reference is made to the foregoing remarks of Mr. Harker as being unduly harsh and severe. Mr. Harker said nothing more than what the testimony of Mrs. Harrison, coupled with the conduct and admissions of respondent, shows to be the fact. From the time the child was born until respondent, in company with Mrs. Harrison, called at the Harker home ten months thereafter, he was entirely indifferent as to the fate of the child. He was advised by Mrs. Harrison three or four weeks after the child was born that it was dangerously ill, but did not call to see it, and the only conclusion permissible under this record is that he made no inquiry concerning the child. During this time neither respondent nor Mrs. Harrison furnished the child with any clothing, nor did they on Christmas even send it a toy or make it a gift of any kind. They cannot excuse this indifference because of any supposed resentment of Mr. Harker to-

wards them, because the undisputed evidence shows that when they called to see the child about two weeks before respondent made a demand for its return they were hospitably received and kindly treated by the Harkers.

Two witnesses, who have known Harrison in the community where he resides and has resided since he was a boy, testified that his reputation for being an upright and moral man is good. It does not appear how many innocent girls it would be necessary for a man to debauch and ruin before these witnesses would regard him as a man of questionable moral character. It is quite evident that one, and probably two, would not be sufficient. Nor does it appear how many illegitimate children a man must be the father of and willfully abandon, leaving them to others to protect, care for, and support, before the witnesses would question his integrity or uprightness as a man. It seems that one, and probably two, are not enough. This, however, has but little, if any, bearing on the case because the evidence of any number of witnesses could not in the face of the admitted facts in this case, make an upright and moral man of him. As I have pointed out, the Harrisons decided before the child was born that it should be given away. This plan they deliberately and voluntarily carried out. And the record justifies the conclusion that it was their intention that the transaction of thus getting rid of the child should be conducted in such manner or way as not to reveal to the party receiving the child who the parents were, and to keep from the parents the name of the party taking the child. Mrs. Harker testified that when she received the child she asked Mrs. Phillips, "May I see the girl (Mrs. Harrison)?" and that Mrs. Phillips answered, "No; she does not want to be seen." She then continued, "I asked her name, and she (Mrs. Phillips) said she had refused to give it." Mrs. Harker further testified: "I saw Mrs. Harrison somewhere between four and five weeks after. She came to my home. . . . I asked her how she found out, and she said, 'I overheard Mr. Smith introduce you to the nurse as Mrs. Harker.'" David Harker testified that he and Mrs. Harker

called at the hospital about four or five weeks after they received the child; that they "went there to find the name of the . . . parents of the child." The disposition made of the child was, under the circumstances, as much a waiver and relinquishment by its parents of their right to its custody, and as complete an abandonment of it, as it would be if they had gone in person in the silent hours of the night and quietly placed the child on the doorstep of the Harker home and left it there, without any intention of ever returning for it. Abandonment consists of "an act of a parent in exposing an infant in any place with intent to wholly desert it." (Anderson's Law Dictionary, 4.) In Black's Law Dictionary abandon is defined as follows: "To desert, surrender, relinquish, give up, or cede." Webster defines abandonment as "the act of abandoning or the state of being abandoned: Total desertion; relinquishment. The voluntary leaving of a person to whom one is bound by a special relation as a wife, husband, or child." See, also, *Gay v. State,* 105 Ga. 599, 31 S. E. 569, 70 Am. St. Rep. 68.

The great weight of modern authority holds that where a parent abandons his infant child, or by agreement or gift relinquishes and surrenders its custody to another without limitation or condition, as was done by respondent and his wife in this case, and thereafter brings an action to recover possession of the child, the primary question, the one of paramount importance, is the present interests and future welfare of the child. In such cases the law, speaking for the child, says to the parent:

"Since you have abandoned the child, or otherwise voluntarily divested yourself of its custody and permitted others to provide it with a home, maintain, clothe, feed and care for it as their own, the child's interest and not your desires or your mere naked legal rights shall control and direct the discretion of the court in the premises."

If it appears that the "physical, intellectual, social, moral, and educational training and general welfare and happiness of the child will be best promoted by leaving it with its foster parents, the presumptive right of the natural parents must

yield to the interest of the child." (*Stanford v. Gray; Hummel v. Parrish, supra.*) And the custody of the foster parents will be treated as lawful, and will not be disturbed. In *Schroeder v. Filbert,* 41 Neb. 745, 60 N. W. 89, the court said:

"The doctrine of this court is that in a controversy for the custody of an infant of tender years the court will consider the best interests of the child, and will make such order for its custody as will be for its welfare, without any reference to the wishes of the parties."

In *Legate v. Legate,* 87 Tex. 248, 28 S. W. 281, the court, in the course of the opinion, says:

"Where . . . a parent, by writing or otherwise, has voluntarily transferred and delivered his minor child into the custody and under the control of another, as in the case at bar, and then seeks to recover possession of the child, . . . the court will not grant the relief unless, upon a hearing of all the facts, it is of the opinion that the best interests of the child would be promoted thereby. . . . The law does not prohibit such a transfer, but, on the contrary, allows the child to reap the benefit thereof when it is to its interests so to do."

And the legal rights of a child three weeks old, in this regard, are just as sacred in the eyes of the law as those of a child three years or even ten years of age. When a parent voluntarily and deliberately divests himself of the control and custody of his infant child by delivering it into the custody of another, with the intention that such change of custody shall be permanent, the legal right of the child to have its interest and welfare considered by the court as the paramount and controlling question in all controversies that may thereafter arise between its foster and natural parents regarding its custody attaches the moment such change of custody takes place, and is complete regardless of the age of the child. It cannot be held, without abrogating this rule, that the rights of children from three to ten years of age are any broader or more sacred in this regard than the rights of infants from one day to three years. There is no rule or principle of law that holds that the rights of a child ten years

·of age are any more sacred than the rights of an infant but a few hours old. It therefore necessarily follows that when the Harkers received the child in question at the hospital and took it to their home, under the circumstances as shown by the record in this case, the change of custody was as complete as it would be if they were allowed to retain the custody of the child until it was eight or ten years of age.

There were two demands made on the Harkers for the ·child. The first demand was made by Mrs. Harrison about four weeks after the child was born, and the other demand was made by respondent about ten months later. The first ·demand was made before respondent and Mrs. Harrison were married. And there is not a scintilla of evidence tending to show that they intended, or ever had intended, to get married. Mrs. Harrison had no home of her own, was in poor health, and at the time was living with her aunt, who was taking "care of her." The undisputed evidence shows that Mrs. Silcocks, who did most of the talking on that occa- ·sion, stated that Mrs. Harrison was an orphan, and that ·she, Mrs. Silcocks, was her guardian. The only inference ·deducible from the evidence is that Mrs. Harrison had no means or property of her own, and was unable to support the child and take proper care of it. In fact the only con- ·clusion permissible is that, if her aunt had not furnished her a home, she would have been, in effect, an outcast and vagrant depending upon charity for the common necessaries ·of life. Since the filing of this opinion Harrison, speaking through his counsel, in a brief filed on petition for rehearing, says, "The girl had absolved him, as the record shows, ·from any obligation to marry her." Hence the demand for the child was not made in contemplation of marriage with Harrison. Under these circumstances, as I view the case, it would have been the worst of recreancy on the part of the Harkers and a violation of the moral and sacred duty they ·owed to the child and to society to properly care for and protect it for them to have surrendered it to Mrs. Harrison, who ·was ill and had no means of support, and was unable to properly care for either herself or the child.

The Harkers have given, and still are giving, the child the considerate, kind, and loving care that indulgent, devoted parents usually bestow upon their children. They have provided, and, if permitted to retain the custody of the child, will continue to provide, it with a good home in which it is, and will continue to be, surrounded with congenial family influences so necessary, if not indispensable, to the moral development and intellectual growth of the child. If it can be fairly said that under these circumstances and conditions it would have been to the best interest and welfare of the child for the Harkers to have surrendered it to Mrs. Harrison, who had no visible way or means of supporting it, and who was physically unable to give it the care and attention it required, to say nothing of the medical treatment necessary to save its eyesight which was being furnished by the Harkers, it follows that Mrs. Harrison was entitled to its custody. But no such inference can be fairly made or deduction drawn from the evidence.

Respondent's right, if he has any right, to have the child returned to him dates from the time the demand was made on the Harkers for the child, ten months after it was born. The great preponderance of the evidence shows that respondent, on the occasion when he and the Harkers met at the hospital four or five weeks after the child was born, stated to the Harkers that he did not want the child—that he wanted them to have it. Mrs. Phillips, who was present, testified:

"Q. Do you remember whether or not Mr. Harrison said in substance that they should keep it? A. He did."

Mr. and Mrs. Harker testified to the same fact. While respondent denies he made any such statement, his admission as to what he said concerning Mrs. Silcock's connection with the affair, and as to what her desires were regarding the child, his failure to make any demand on that occasion and for nine months thereafter for the custody of the child, tend to neutralize the force and effect of his denial, if it does not entirely destroy it. Moreover, the irresistible effect of this evidence, coupled with his conduct from that occasion until the last demand was made, is to brand his statement

that he postponed the bringing of the suit for more than a
year after the child was born because of his wife's illness as
a reckless and unconscionable falsehood.   To hold in the
face of this record that the Harkers, in their retention of the
child from the time respondent met them on the occasion re-
ferred to until the bringing of the action, were wrongdoers
is, in effect, to condemn the most praiseworthy and perfect
of charities, and to offer a premium for the most inexcusable
and indefensible of moral delinquencies of which parents
can be guilty toward their children.

I think the record clearly shows why the Harrisons waited
some months after the first demand was made before they,
or either of them, again demanded the child from the
Harkers.   The day after the Harkers received the child at
the hospital—twenty-four hours after it was born—they dis-
covered that its eyes were sorely afflicted.   Mr. Harker tes-
tified, and his testimony is not denied, that "for the first
eight or ten weeks the child was almost blind; the doctor
said it was a chance as to whether it would ever gain its eye-
sight or not."   Mrs. Harker's testimony on this point was
substantially the same as that given by her husband.   Mrs.
Harrison testified that when she, in company with her aunt,
called on the Harkers about four weeks after the child was
born, "its eyes were bad."   "Q.   What condition were they
in?   A.   Well, she could not open them at that time."
Harrison, on cross-examination, admitted that Mrs. Harrison
on that day informed him that the child was afflicted with
sore eyes.   A few days thereafter he and Mrs. Harrison were
married.   A day or two after the marriage took place Harri-
son met the Harkers and the baby at the hospital where the
child was born.   The child's eyes were still sore and in a
dangerous condition, and it follows that Harrison was fully
advised of this.   The evidence is all but conclusive that
Harrison on that occasion said to the Harkers that neither
he nor his wife wanted the child.   Notwithstanding the
Harrisons resided but a few miles from the Harkers and
knew that the child was ill and in danger of losing its eye-
sight, yet neither of them called to see it or made any in-

quiry of the Harkers concerning it. Mrs. Harrison testified that she inquired about the child, "not directly from the Harkers," but that she "heard from the child in other ways." By making these inquiries she no doubt was advised when the child's eyes got well, and when it recovered from the measles and other ailments common to infants, with which the evidence shows the child was afflicted during the winter. The Harrisons, about April or May, and after the child, through the tender care and nursing of the Harkers and the medical treatment paid for by them, had fully recovered from the ailments referred to, called on the Harkers to see the child. Now, the record shows one of two things, namely: That the Harrisons did not form any intention to try and get possession of the child until they saw it on that occasion; or that they adopted a "waiting policy" with a view of ascertaining whether or not the care, nursing, and attention the child was receiving at the hands of the Harkers and the medical treatment they were procuring for it would save its eyesight and cure it of the other ailments with which it was afflicted during the winter, and, if the child survived and retained its eyesight, then they would endeavor to get possession of it. It is evident, however, that if the child had been so unfortunate as to lose its eyesight, no second demand would have been made on the Harkers for its possession, and this action would not have been brought. As I read the record this is so plain, so self-evident, that the question is not even debatable. Therefore it was not the illness of Mrs. Harrison that caused the delay in bringing the action, but the uncertainty as to whether or not the child would recover from the different ailments mentioned with its eyesight unimpaired.

Passing, now, to the situation of the respective parties to this controversy, including the child, at the time respondent made a demand on the Harkers for the child ten months after it was born. The evidence shows that Mrs. Harrison is a woman of weak character, and is easily influenced by people with whom she comes in contact. She permitted respondest to establish and carry on illicit relations with her

without exacting from him a promise of marriage. When she discovered that she would soon become a mother because of those relations, instead of requesting him to marry her and thereby repair the wrong, so far as he was able, she kept the matter "quiet," and permitted him to take her to a private hospital and leave her there,' without even providing the necessary clothes for the child when born, or furnishing her the means to obtain them. And, finally, in order to cover up her shame, and to shield him from trouble, she, with his approval, if not his solicitation, gave the child away. Three or four weeks thereafter she, under the influence of her aunt, demanded that the child be returned to her. She testified, "Aunt Jane wanted me to have it, and I wanted it myself." A few days after the demand was made she apparently again changed her mind and decided not to claim the child; at least she did not take any steps, nor have respondent take any, to get the child until ten months after it was born. The record clearly shows that, from the time she discovered that she would soon become a mother until the bringing of this action, the welfare and even the fate of the child had been to her a matter of secondary consideration only. The evidence shows that respondent has never exhibited any affection for either the child or its mother. He has shown less regard for the child than dumb animals usually show for their offspring. The printed brief of counsel for appellants contains the following trenchant, terse, and correct summary of the situation as I view the record:

"At least on one other occasion the respondent committed a similar flagitious crime to the one in this action disclosed, with the possible exception that in the one instance he did not marry the woman. The illicit relations, the abandonment of the fruits of the same, the shirking of all responsibility in the premises are identical in both cases. . . . In view of the record . . . made by both Mr. and Mrs. Harrison, and particularly the record of Mrs. Harrison, what assurance is there that their self-respect and self-control and their affection for the child will be any stronger in the future than it has been in the past? Mr. Harrison's immoral propensi-

ties have at least twice overpowered him, and twice has he shown absolutely no parental affection for his offspring. . . . The Harrisons, although being the father and mother of the child, willingly, deliberately, and intentionally gave it away—abandoned it. The Harkers, although strangers to it, welcomed it, and became and are now, in care, tenderness, love, and affection, all that they could be were the child their own. . . . The Harkers rescued the child from the pitiable condition of want in which respondent and the mother left it, supplied its every need, nursed it through spells of sickness and the many ills of infancy, giving it both the services of a doctor and of a trained nurse, when needed, and through their tenderness towards and love for it saved its life as far as it is in human power to do. . . . The record shows the Harkers to be both suitable and capable from every point of view to have the care, custody, and control of the child. Their characters and reputations are untarnished; their domestic relations, after fourteen years of married life, are harmonious; their financial circumstances are ample; and their lives are such as to practically insure the child of everything that would contribute to its proper care, development, and growth morally, socially, and financially."

The child, if permitted to remain with the Harkers, is assured of the advantages of harmonious, congenial family influences; that it will continue to receive the same considerate, kind, and affectionate care in the future at their hands that it has received in the past; and that it will receive the proper social, moral, and intellectual training. In other words, the child in the present home is assured of the same advantages that children have generally whose parents are kind, honest, industrious, and moral people, and whose domestic relations are pleasant and reciprocal. Again quoting from counsel's brief:

"All that the child could wish for, all that the laws of society and the state could exact, the child now has and enjoys, and will continue to have and enjoy."

Moreover, the record shows that the Harkers as a family are in some respects exceptional people. They are of that class, the number of which is very limited, comparatively speaking, who are willing to take into their homes infants born out of wedlock, and who have been deserted and abandoned by their parents, as the child in question was in effect deserted and abandoned, care for, support, maintain, educate, and give such children the same advantages as they do children born to them. And even among this exceptional class, composed as is of sympathetic, kind, warm-hearted, charitable, and benevolent individuals, the Harkers are, in some respects, superior people. This was made manifest by their attitude and conduct toward the child when they, within twenty-four hours after it was born, discovered that its eyes were afflicted with some kind of malignant disorder, ailment, or disease. Notwithstanding the additional expense, trouble, and inconvenience they would be put to because of this malady, and the inferences that ordinarily well-informed people would, under the same or similar circumstances, deduce, and which they would be justified in deducing, as to the origin and cause of this malignant affliction of the eyes, the Harkers, instead of rushing back to the hospital with the child and leaving it there, as, we may well conclude, the majority, if not practically all, of those who are disposed to take into their homes unfortunate infants would have done, kept the child. The child's misfortune, and its pitiable condition in being thus afflicted, instead of causing the Harkers to pause and hesitate as to whether they would keep the infant or return it to the hospital, seemed to more thoroughly arouse their sympathy and compassion for it in its unfortunate and helpless condition. While the Harkers have no children of their own to occupy any of their time and attention, and while Mrs. Harker has had much experience as a nurse in caring for and attending to infants, they nevertheless, in order that the child might have all the tender care and attention that it was possible for human hands to give it, employed a trained nurse to assist them in watching over and caring for the child during the first ten

days that it was given medical treatment, paid for by them, for its eyes. On the other hand, the record shows respondent to be the embodiment of selfishness and ingratitude, and that he has no affection whatever for the child, and but little, if any, for its mother. He is the father of at least one other child born out of wedlock which he has abandoned as he in effect abandoned this child for ten months, during which time the record shows he was utterly indifferent to its fate. Therefore what assurances have we—and certainly the record furnishes none—that the child's presence in the Harrison home will not be an element of discord and strife, rather than one of peace, good will, and domestic harmony? Let that be as it may, as I read the record the only conclusion permissible from the facts, viewed in the light most favorable to respondent and his wife, is that it will be for the best interest of the child to remain with the Harkers, and that to take it from its present happy home and the kind and loving care of its foster parents and the wholesome influences with which it is surrounded, and place it in the home of the Harrisons, will have a detrimental, if not a blighting, effect upon the child's moral and intellectual growth. I have made diligent search but have been unable to find a case, not even a "sporadic" case, in which the doctrine announced by this court in *Stanford v. Gray* and *Hummel v. Parrish, supra,* where a parent, under the circumstances and conditions such as the record discloses in this case, was given the custody of the child. There are, however, numerous cases in which the facts are much more favorable to the parent than they are in this case, yet the court refused to award him the custody of the child. *Sturtevant v. State,* 15 Neb. 459, 19 N. W. 617, 48 Am. Rep. 349, is a case in which a father brought *habeas corpus* proceedings to obtain the custody of his little daughter, who was only eight months old. The trial court found:

"(2) The relator (father of the child) is a man in every way well qualified and able to have and exercise the care and custody of said child. That he is possessed of ample means to raise, educate, and provide for her, etc.

"(3) That respondents are also proper persons to have the care and education of the child, . . . and are now greatly attached to her.

"(4) During the last sickness of the relator's wife, and a few days after her death, and when said deceased as well as the relator and respondents expected her death soon to occur, the said wife asked the respondent S. L. Sturtevant to take said child and raise and care for it in all respects as his own. That said respondent agreed to do so, and answered said request in the affirmative. That the relator was present at said conversation and *did not assent to or dissent from said proposition, but remained silent.* (Italics. mine.) . . .

"(6) That, in taking said child to their home, respondents claim to have acted upon the said request of the relator's wife.

"(7) That said relator visited said child at the home of respondents three different times between the 8th day of January, 1883, and the 15th day of April, 1883, but did not demand said child from respondents at any of said times.

"(8) That, . . . being in poor health and distressed in mind on account of the death of his wife, said relator went East on a visit, and did not return until June 18, 1883, and a few days thereafter . . . he demanded said child from respondents, who refused, and have ever since refused, to deliver her to the relator."

The court also found that the child was born on December 6, 1882, and that its mother died January 8, 1883. The court also found that:

"Relator is twenty-three years old, and has no other children and no one depending on him, and that the respondents are both about 42 years of age, and have two daughters now living."

As conclusions of law the court found that:

"The relator, Anson L. Havens, is entitled to the care, custody, companionship, and education of said Ella Nettie Havens."

The Supreme Court of Nebraska, in an opinion reversing the judgment of the trial court in that case, says:

"That in controversies similar to this, especially where the infant is of the tender age of the one contended for, the court will consider only the best interest of the child, and make such order for its custody as will be for its welfare, without any reference to the wishes of the parties. Applying this rule to this case, we are forced to the conclusion that the conclusions of law as stated by

the district court are not sustained by the findings of fact. . . .
It is no doubt true that the defendant in error is greatly attached
to this child, and the facts as found by the court show that he is'
in every respect a suitable person to have its care and custody.
. . . The grandparents have had the custody of the child since
its birth, are greatly attached to it, have ample means to provide
for its wants, and have the judgment and experience so essentially
necessary in rearing a child of its age. It seems to us no further
reasoning is necessary to convince any one that it is better for the
child to remain where it is," etc.

I have copied somewhat copiously from the Nebraska case
because the child there in controversy was approximately
eight months old at the time the parent demanded the cus-
tody of it, and about two years of age when the case was de-
cided by the Supreme Court. In the case at bar the child
was ten months old when respondent demanded it from the
Harkers, and it will be approximately three years old by
the time the decision of this court becomes final. The two
cases in this respect are quite similar.

*Jones . v. Darnall*, 103 Ind. 569, 2 N. E. 229, 53 Am.
Rep. 545, is another case in which a father brought suit to
regain the custody of his infant son, who was but a few
months old. In that case, as in the Nebraska case, the child,
after the death of its mother, was given to its grandparents
to be cared for and reared by them. The facts in the two
cases were almost identical. The trial court in the Indiana
case found that the father was a fit and proper person to have
the care and custody of his child, and rendered judgment in
his favor. The Supreme Court, after citing with approval
the Nebraska case and a number of other authorities which
declare the same doctrine, disposed of the case in the follow-
ing language:

"In the case in hand, after carefully examining and considering
all the evidence appearing in the record, we have reached the con-
clusion that the best interests of appellee's child imperatively re-
quire that it should be suffered to remain, during the tender years
of infancy, at least, in the custody and care of its grandparents,
and that the court should have refused to direct the delivery of
such child to its father."

44 Utah 39

In each of the cases last referred to, the evidence support-
ing the parent's claim of right to the custody of the child
was much stronger than it is in the case at bar.   Those cases
were cited with approval by this court in the case of *Hum-
mel v. Parrish, supra.*   The affirmance of the judgment of
the lower court in this case, not only repudiates the doctrine
announced in those cases, but overrules the cases of *Stanford
v. Gray* and *Hummel v. Parrish, supra.*   In the prevailing
opinion these cases and the case at bar are distinguished; but
it is a distinction made where there is no difference, except
that in each of those cases the evidence was much more
favorable to the parent and also much less conclusive that it
would be for the best interest of the child to remain with its
foster parents than it is in the case under consideration.   In
*Stanford v. Gray* the mother of the child was an honest, in-
dustrious young woman, twenty-four years of age.   She kept
and supported her child by her daily labor until it was
about twenty-one months old; then, for reasons set forth in
the opinion not necessary to repeat here, she placed it in a
charitable institution, with the understanding that it should
be adopted in a good home.   A short time thereafter the
mother sought to recover her child, but was informed that it
had been taken from the institution where it was left, to be
adopted.   She immediately commenced a search for the
child, and, when she succeeded in locating it, commenced an
action to recover possession of it.   The trial court found,
and the evidence supported the finding, that the mother was
"a fit and proper person" to have the control and custody of
the child.   It will readily be seen by examining the record
of that case in connection with the record of the case at bar
that the mother of the child in that case is much more compe-
tent and in every way better fitted to have the care and cus-
tody of a child of tender years than is the respondent here,
even when assisted by his wife.   This court, nevertheless,
held in that case that:

"The mother having voluntarily relinquished and surrendered
her right to the care and custody of the child, the burden is on
her to show that the parties who acquired the custody of the child

by virtue and in pursuance of the relinquishment have in some way been derelict in their duty to the child, and that it would be better for the best interests of the child to take it out of their custody and return it to her."

Mr. Justice Frick, in a concurring opinion in the case, says:

"Suppose the mother should again ·meet with misfortune such as in her judgment would . . . justify her to abandon the child; would she not again abandon it precisely as she did to further her own welfare? (This is also the query in the case at bar—a query not answered or solved in any respect in favor of the mother in the prevailing opinion.) Under such circumstances, the sympathy that we naturally entertain for the mother should not be permitted to sway our judgment. In view, therefore, that the mother has surrendered her natural or legal right to the exclusive custody and control of the child, *this court has but one duty to perform, and that is to protect the best interests and welfare of the child.*" (Italics mine.)

In the Hummel Case Mr. Justice Frick, in a concurring opinion, among other things, says that:

"The record conclusively shows that the mother's past conduct was not such as inspires one to believe that she has a very exalted conception of what a young woman's conduct and deportment should be. While, so far as the mother is concerned, one may well overlook her error, yet when one is charged with determining the welfare of a young girl (as in the case at bar), one may well hesitate before taking her from a virtuous and in all respects desirable home and expose her to at least unknown conditions and surroundings. Conceding, therefore, the naked legal rights of the mother, yet I have not the slightest hesitancy in saying that the record is conclusive that the best interest of the child and the equities of respondents (the foster parents) far outweigh those legal rights. Under such circumstances, we owe it to the child, to the state, and to ourselves not to permit any experiments with respect to the welfare of a young girl who is nameless and helpless and must look to us alone for protection."

If the foregoing was good and wholesome doctrine in those cases, why is not the principle equally as potent in determining the equities and best interest of the child whose fate, if not its very existence, is at stake in the case under consideration? As I have stated, a comparison of·the records of those

cases with the record in this case will show that there is much less merit to respondent's claim to the custody of the child here involved than there was to the claim of the natural parent in either of the cases mentioned. If the doctrine announced in the cases of *Stanford v. Gray* and *Hummel v. Parrish* is to be the rule of decision in this state in this class of cases, the judgment of the lower court must be reversed, because the affirmance of the judgment is necessarily a repudiation by this court of the doctrine upon which those cases were ruled and decided. From this there is absolutely no escape. This court, by affirming the judgment, not only overrules the two cases mentioned, but, in effect, says to the kind-hearted sympathetic and generous people of this state who are willing and are disposed to take into their homes infant children who are given away and abandoned by their natural parent, as the child in question was given away and abandoned, and by adoption make them their own and give them all the advantages, opportunities, and legal rights that children born to them enjoy:

"You may receive and take into your home a homeless waif that has been given away and abandoned by its parents, or, for that matter, left by them on your doorstep in the silent hours of the night, without any intention of returning for it; you may nurse, care for, and support it with the intention of adopting and making it your own, but you do so at your peril. Should the parent, after you have had the child for months, or even years, under these circumstances and conditions, demand of you its return to him you must comply with the demand, even though his delinquencies in his moral duties to the child and its mother bring him to the border line of moral degeneracy and your legal rights in the premises are no more than they would be if you were kidnappers and had stolen the child."

While this is the effect of the prevailing opinions, it nevertheless does not accord with my notions of justice, equity, or humanity, nor with what I think court-made law should be.

Mr. Justice Frick, in the prevailing opinion, asks the question:

"Suppose Mr. Harrison should die next week, or next month, or next year, and leave a large fortune; would not the child in question be his legal heir under our statute?"

Comp. Laws 1907, section 2833, answers the question as follows:

"Every illegitimate child is an heir of the person who acknowledges himself to be the father of such child, . . . and inherits his or her estate in whole, or in part, as the case may be, in the same manner as if he had been born' in lawful wedlock."

It seems that this section gives an illegitimate child the right to inherit the estate "in whole or in part" of a person who acknowledges himself to be the father of such child, regardless of whether such acknowledgment is public or private. While this section answers the question propounded by Mr. Justice Frick, it has no bearing on any of the questions presented by this appeal.

Comp. Laws 1907, sections 4 and 6, tit. 2, are general provisions relating to the adoption of children. Section 10 provides how and in what manner a father may adopt his illegitimate child, and is as follows:

"The father of an illegitimate child by publicly acknowledging it as his own, receiving it as such with the consent of his wife, if he is married, into his family and otherwise treating it as if it were a legitimate child thereby adopts it as such, and such child is thereupon deemed for all purposes legitimate from the time of its birth. The foregoing provisions of this title do not apply to such an adoption."

Whatever right respondent has to the custody of the child he has acquired under and in pursuance of section 10. It will be noticed that three things are required of a father who seeks to adopt his illegitimate child under this section of the statute: (1) He must "publicly" acknowledge the child as his own, (2) receive it as such into his home, and (3) "otherwise" treat it as if it were a legitimate child. (*In re Garr's Estate,* 31 Utah, 57, 86 Pac. 757.) There is not a scintilla of evidence tending to show that respondent, at any time, or on any occasion prior to the filing of the complaint

herein, "publicly" acknowledged the child as his own, or that he, on any occasion, treated it "as if it were a legitimate child." On the contrary, his own evidence shows that he not only failed to publicly acknowledge that he was the child's father, but, to prevent that fact from becoming "publicly" known, permitted it to be sent adrift into the world a nameless waif to be cared for, reared, and educated by others who were ignorant as to who its parents were. And the evidence justifies the inference that respondent, from the time he learned that the child's mother was, because of his illicit relations with her, in a delicate condition until he and Mrs. Harrison were married, was very much "worried" because it might become publicly known that he was the child's father. Mrs. Phillips, in her testimony, referring to the time that Mrs. Harrison was in the hospital, said:

"This young woman was in my home for three weeks. Mrs. Harrison during this time mentioned the subject of the baby once that I remember of. I don't remember Mr. Harrison mentioning the child on any of his visits to the hospital."

The evidence without conflict shows that when he met the Harkers at the hospital, about four or five weeks after the child was given away, he "saw the child at that time," that he "did not take it," and that he "paid no attention whatever to the child." Nor did he do or say anything on that occasion that could be construed as an acknowledgment that he was the child's father. Nor did he say or do anything from which it can be inferred that he intended to adopt the child. The great preponderance of the evidence, however, does show that he did say on that occasion that neither he nor Mrs. Harrison wanted the baby. When he made a demand on the Harkers nine months later for the return of the child, he neither said nor did anything from which it can be said that he publicly acknowledged that he was its father. The only thing said or done by him on that occasion that could possibly be construed as even an implied admission that he was the child's father was the bare naked demand he made for the custody of the child. The undisputed evidence shows

that he coupled the demand with the statement that his wife "was pining for it," and he "wanted it," and that they had "changed their minds," and his "wife wanted it." He admits that at the time he made the demand he saw the child, but, quoting, "I did not pick it up; I did not handle it at all." This was not in any sense a compliance with the foregoing provisions of the statute relating to the adoption by a parent of his illegitimate child. He neither publicly acknowledged the child as his own, nor did he "treat it as if it were a legitimate child."

Section 10, supra, of our statute is a literal copy of section 230 of the California statute (2 Kerr's Cyc. Codes Cal. section 230). In the case of Blythe v. Ayres, 96 Cal. 532, 31 Pac. 915, 19 L. R. A. 40, the Supreme Court of California, in construing section 230, said:

"The public acknowledgment of the child is the main fact. It is the important factor, in the eyes of the law."

Again, in the same opinion:

"The statute clearly means that the father must treat his illegitimate child as he would naturally treat his legitimate child."

In the case of Garner v. Judd (Cal.), 64 Pac. 1076, the court said:

"There can be no compliance with section 230 in the absence of the conditions contemplated by that section, and absolutely necessary to give it effect."

The same thought is expressed in Garner v. Judd, 136 Cal. 394, 68 Pac. 1026; Cebrian v. De Laveaga, 142 Cal. 158, 75 Pac. 790; In re Jones' Estate (Cal.) 135 Pac. 288. In 5 Cyc. 633, it is said:

"While one may by his acts be held to have sufficiently recognized a child to legitimate it, loose acts of occasional recognition or an occasional apparent recognition during the first years of the child's life at the home of its foster parents have been held insufficient."

Several well-considered cases are cited in the footnotes which support this doctrine.

In the case at bar respondent, prior to the filing of the complaint, as I have pointed out, had neither publicly acknowledged the child as his own, nor at any time or upon any occasion treated it as if it were a legitimate child. Having failed to comply with the statute in these respects, it follows that he has not adopted the child, and therefore has no legal right to its custody, and cannot maintain this action.

Since the draft of this opinion was prepared and submitted to my Associates, Mr. Justice Frick has added to, or rather written an addenda to, his original opinion, and Mr. Justice Straup has also written an opinion concurring in the conclusions reached by Mr. Justice Frick. In view of what I think will be the far-reaching and baneful effect of the prevailing opinions upon the life of the little child in question, and upon like cases that may hereafter come before this court, and since I have failed to make clear my position regarding some of the propositions discussed in the first draft of my opinion, I have been impelled to make some slight changes in the opinion, and to venture a few observations in addition to those hereinbefore set forth. Mr. Justice Straup, in his concurring opinion, says:

"The father by his petition publicly acknowledging the child as his own, legitimated it."

Mr. Justice Frick expresses the same thought. It is therefore judicially determined that the child is legitimated by the filing of the complaint in this action. The child, being thus legitimated, will remain so, irrespective of whether the statute has been complied with or not. The status of the child in that regard, being fixed, cannot be affected by the disposition made of this case. My contention is—and I respectfully submit I am fully supported by the record—that there is not a scintilla of evidence tending to show that respondent, at any time, or upon any occasion prior to the filing of the complaint, publicly acknowledged that he was

the father of the child.    Mr. Justice Frick, among other things, says:

"Did he not go to the hospital before the child was born and make arragements for the care of Mrs. Harrison during her confinement? And did he not, when he met the appellants at the hospital a few weeks after the child was born, acknowledge it as his own? Did he not do so again when he demanded its custody from them?"

Respondent in his own testimony answers the first question wherein he said:

"Q.   Did you talk the matter over as to the best place for her (Mrs. Harrison) to go?   A.   She found that out herself. I never found out at all about it.   I left that responsibility to her   .   .   .   I worried about it."

As I have hereinbefore pointed out, and as the admitted facts show, Mrs. Harrison went to this private hospital and remained there during her confinement in order to enable her and respondent to keep the entire matter concealed from the public.   And during the time she was at the hospital respondent, so far as shown, never mentioned the child to any one except Mrs. Harrison.   And yet we are told, if I correctly understand the import of Mr. Justice Frick's questions, that respondent's reticence in that regard was an act amounting to a public acknowledgment that he was the father of the child.   Moreover, Mrs. Phillips, who was a disinterested witness, testified, and her testimony is not disputed, that:

"On July 15th Mrs. Harrison came to my home and stated her condition and asked me to take care of her through the confinement, and I told her I would.   .   .   .   She first came to my place on Saturday, the 15th, to see me and remained there Saturday night.   .   .   .   Mr. Harrison accompanied Mrs. Harrison to the hospital on the evening of the 16th.   The child was born   .   .   .   Monday, July 17th."

This evidence and that given by Mrs. Harrison, coupled with the positive testimony given and the admissions made by Mrs. Harrison, show that the claim made by her that the birth of the child was premature, and that she was there-

by prevented from providing the necessary clothing for the child, is a mere subterfuge. It, however, has no material bearing on the case, and I would not refer to it if it were not for the fact that seemingly great importance is attached to it in the prevailing opinion, as well as to other trivial and, as I view the record, like groundless excuses made by the Harrisons for their cold indifference to and unnatural attitude toward the child for the first ten months after it was born. It is also a sufficient answer to the second proposition propounded in the form of a question to quote from respondent's evidence on that point wherein he says:

"They (the Harkers) said, 'If you wanted the child, why didn't you come before we got attached to it?' *I did not say anything.* Q. What did you say? A. I don't remember saying anything. Q. Did you demand the child from the Harkers on that occasion? A. No, sir; I didn't. Q. You did not tell them you wanted the baby at some future time? A. No, sir."

In find nothing in this testimony that in the remotest degree tends to show that respondent on that occasion publicly or otherwise acknowledged that he was the father of the child. In answer to the third proposition, I invite attention to the statements made by respondent when he demanded the child from the Harkers ten months after it was born, which I have hereinbefore referred to and set forth. And I again insist that those statements did not amount to an acknowledgment on his part that he was the father of the child.

Mr. Justice Frick refers to my discussion of the merits as follows:

"In answer . . . to the question of the Chief Justice, which he propounds in various forms, and the substance of which is: 'What more is necessary to brand Mr. Harrison as utterly unfit to have the care, custody, and nurture of this child?' I answered that the only thing that is really lacking is sufficient competent evidence to establish his unfitness."

The pivotal question is not whether respondent is wholly unfit to have the custody of the child. As I have repeatedly stated in this opinion, the vital, the paramount, the controll-

ing question is: Would the present interest and the future welfare of the child be best subserved by leaving it in the care and custody of its foster parents, or would its interest be best subserved and promoted by giving it to respondent? Keeping in mind this theory of the case, what acts or omissions showing moral turpitude, may I ask, would it be necessary for respondent to be guilty of against the child and its mother, in addition to those shown and established by the record, before the scales would tip in favor of the Harkers? I must confess my inability to answer the question. It seems to me that under the prevailing opinions respondent in order to forfeit his right to the custody of the child, because of neglect or illtreatment of it or its mother, must commit some act against one or both of them amounting to a felony, be tried, convicted, and sentenced to the state prison. Abandonment, desertion, and willful neglect, coupled with his other moral delinquencies herein referred to, are not sufficient, otherwise the judgment of the trial court would be reversed. It would be difficult to conceive of wrongs of the character in question more aggravated and involving greater moral turpitude than those of which respondent, by his own evidence, coupled with the testimony of his wife, stands convicted. It seems that, from the time respondent first learned that Mrs. Harrison would soon become a mother until the present inherent rights of the child, as well as its interest and welfare generally, have, at most, been a matter of secondary consideration only—and for the first ten months of its life no consideration at all with the Harrisons—with all (except the Harkers) who, in a legal sense, have had anything to do or say regarding its welfare. Now, as the acme and culmination of its misfortunes, it is to be taken from its present happy home and the moral, refined, elevating, and congenial family influences with which it is surrounded, and where it is secure in all that a child requires to insure it a healthful, moral, and intellectual growth, and be given into the custody of the cold, unsympathetic, selfish, and ungrateful man who has not, and never has had, a particle of affection for it, and who caused the child to be

born out of wedlock, and then permitted it to be given away and sent into the world, unknown and nameless, and who later, when it was very ill and in danger of losing its eyesight, never went near it, never offered to assist it, and the only reasonable inference that can be drawn from the record is that he never made any inquiry about it. And we are told that this is done to promote the interest of the child. That is, according to the prevailing opinions it is presumed that by taking the little girl from her present home, where she is happy and contented, and is nurtured and warmed by the love and tender care of the Harkers, and transplanting her into the cold, unsympathetic, uncongenial, and repellent social atmosphere, which, in view of the admitted facts, we are justified in believing pervades the home of the Harrisons, her present physical, moral, and intellectual training will be improved on, and her development along these lines better assured. As I view the situation, it would be just as reasonable to take a fragrant, delicate, tender tropical flower from its natural soil and transplant it into an iceberg, and expect it to grow and thrive, and to permeate the atmosphere with its sweetness and fragrance, as to anticipate any such result.

In the prevailing opinion it is suggested that in my discussion of the merits I am unduly harsh and severe in characterizing the acts and omissions of respondent and Mrs. Harrison in their conduct toward and treatment of the child. It is said that what are termed my "strictures" in that regard are "not justified by the evidence when considered in all its parts." By an examination of the record in connection with my opinion, it will be seen that there is not a statement made in the opinion regarding the merits of the controversy, or an inference deduced, or a conclusion reached that is not fully supported, warranted, and justified by the evidence "when considered in all its parts." Furthermore, since the rule of law in this state is to be that individuals of weak moral character and "easy virtue" may, in violation of the penal statute, and in defiance of decency, good morals, and society, bring into the world illegitimate children, and

soon after the children are born give them away and send them into the world nameless waifs, without any intention of ever reclaiming them, and if these children are taken by sympathetic, kind-hearted, and generous people into their homes, with assurances that they are to keep and rear them as their own, and after the foster parents have cared for, watched over, and protected them and given them the same tender care and attention as the children born to them receive, and this association and companionship have ripened into a deep and abiding affection for the children, as in the case at bar, the natural parent, or parents, as the case may be, may reclaim the children ten months after they have parted with them, regardless of the interests and welfare of the children, and in all controversies arising between the natural and foster parents involving the right to the custody of the children, the natural parents—the transgressors of both the moral and penal codes—are to be surrounded by a halo barring just comment or criticism for their wrongdoing, and the foster parents are to be judicially reproved and held to be wrongdoers because of their magnanimity in rescuing the little ones from oblivion, taking them into their homes, making the same unselfish sacrifices for them and giving them the same tender care and consideration that the children of their own flesh and blood receive, the people of this state are entitled to be advised of it, especially those who are inclined to take these unfortunate children into their homes and adopt them. And they are entitled to be advised of the facts and circumstances of the particular case in which the rule was inaugurated, so that they may thereby govern themselves accordingly. This is one of the reasons that have impelled me to review and discuss the case at considerable length.

In the prevailing opinion some speculation is indulged in regarding the effect this dissenting opinion may have on the child and its welfare in after years when she shall grow up and become a woman. There is absolutely no ground whatever for apprehension on the part of my Brethren on that ground. The present interest and future welfare of the

child is not, and will not be, prejudiced by the dissenting opinion. Whatever misfortune may come to this unfortunate child because of this litigation will be due, not to the dissenting opinion, but to the prevailing opinions. The child has certain rights, and it is the recognition and enforcement of those rights that I have all through this opinion contended for.

Mr. Justice Straup's discussion of the case, considered as it should be in connection with the facts of the case as disclosed by the record made in the court below, reduced to its final analysis, is to the effect that in controversies of this kind, involving the right to the custody of a child, before the natural parent will be denied his legal right to its custody, it must be shown that he is either morally unfit to have the care, training, and education of it, or is unable to properly provide, care for, and support it, and that the interests and welfare of the child is a matter of secondary consideration only. This doctrine finds support in some of the earlier cases both in this country and in England. The rule, however, has become obsolete, and is contrary to what is now the settled law in nearly every state in the Union. Mr. Bishop, in his excellent work on Marriage, Divorce & Separation, vol. 2, section 1171, says:

"In American cases of recent date, so numerous as to constitute an established doctrine, where one or both of the parents, being poor, or otherwise unable to take the care of their young child, have verbally or by conduct relinquished it to competent and willing persons, commonly relatives, who have entered upon their assumed duties and established a partial or full de facto relation of parent and child, neither the real parents, nor even the father, or a change of mind or of circumstances, has been permitted to resume the custody, where the interests of the child would not thereby be promoted. . . . Plainly, in principle, the arrangement between the parent and the new custodian need not be such as could be forced while executory."

I also invite attention to Nugent v. Powell (Wyo.), supra, in which the question is elaborately and ably discussed, and many authorities cited and reviewed.

Mr. Justice Straup, in the course of his opinion, says:

"I do not think any one will seriously contend that a parent's legal right to the custody of his child will be denied him, where an abandonment, or a forfeiture, or laches, or a legal surrender, or unfitness or inability of the parent is not clearly shown."

The American decisions in this class of cases (including the Gray and Hummel Cases, recently decided by this court) practically all hold that where, as in the case at bar, a parent has by word or act voluntarily relinquished and transferred the custody of his infant child to another, without any intent on his part of ever reclaiming it, and such party is in every respect a proper person to have the care, custody, training, and education of the child, in all controversies thereafter arising between the natural and foster parents involving the right to its custody the present interests and future welfare of the child, not the legal rights of the natural parent, will direct the discretion and control the judgment of the court. And, as was well said by the Supreme Court of Virginia, in the case of *Stringfellow v. Somerville,* 95 Va. 701, 29 S. E. 685, 40 L. R. A. 623:

"The question is not which of the two claimants can surround the infant with greater luxury, or which of the two will be able to give or bequeath him the greater amount of money or property, but *with which of them he is likely to 'be reared and trained so as to make him the better man and the better citizen.*" (Italics mine.)

In *Stanford v. Gray, supra,* recently decided by this court, it is said:

"We do not wish to be understood as holding, or even intimating, that the Hansens are unsuitable persons to have the care and custody of the child in question. What we do hold is that, Mrs. Hansen having voluntarily relinquished and surrendered her right to the care and custody of the child, the burden is on her to show that the parties who have acquired the custody of the child by virtue and in pursuance of the relinquishment have in some way been derelict in their duty to the child, and, that it would be better for the best interests of the child to take it out of their custody and return it to her. This she has wholly failed to do."

I submit that it is impossible to reconcile the doctrine of that case, which was reaffirmed by this court in the Hummel

Case, with the obsolete rule of law adhered to by Mr. Justice Straup in his concurring opinion.

Again referring to the question of abandonment: Under the authorities hereinbefore cited the disposition made of the child by the Harrisons was in fact and in law an abandonment of it. I invite attention to the following cases, which contain the more recent expressions of the courts of last resort as to what constitutes abandonment in this class of cases: *Parsons v. Parsons,* 101 Wis. 76, 77 N. W. 147, 70 Am. St. Rep. 894; *Wood v. Wood,* 77 N. J. Eq. 593, 77 Atl. 91; *Winans v. Luppie,* 47 N. J. Eq. 302, 20 Atl. 969. In *Parsons v. Parsons* the court said:

"The term abandonment . . . means no more than neglect or refusal to perform the natural and legal obligations of care and support which parents owe to their children."

This thought is expressed in *Wood v. Wood.* In *Winans v. Luppie* it is said:

"The statutory notion of abandonment does not necessarily, we think, imply that the parent has deserted the child, or even ceased to feel any concern for its interests. It fairly may, and in our judgment does, import any conduct on the part of the parent which evinces a settled purpose to forego all paternal duties and relinquish all parental claims to the child."

If the foregoing is good law—and I have been unable to find a modern authority that holds to the contrary—the undisputed facts of this case clearly establish abandonment of the child by the Harrisons. I invite attention to the notes to the case of *Clark v. White,* 102 Ark. 93, 143 S. W. 587, Ann. Cas. 1914A, 740, wherein the annotator cites and reviews many English cases and numerous American decisions, state and federal, in which the questions here involved are discussed. See, also, case of *In re Cozza,* 163 Cal. 514, 126 Pac. 161, Ann. Cas. 1914A, p. 221, and notes. I also invite attention to the case of *Allison v. Bryan,* recently decided by the Supreme Court of Oklahoma, 26 Okl. 520, 109 Pac. 934, 30 L. R. A. (N. S.) 146, and notes, 138 Am. St. Rep. 988.

The affirmance of the judgment must rest on the obsolete rule of law stated by Mr. Justice Straup. Otherwise, this court in effect holds that persons in the prime of life who are kind, sympathetic, honest, moral, and upright, and are fairly well to do in a financial way, whose domestic relations are pleasant and congenial, and who are in every respect model citizens, are not more suitable and more worthy to have the care, custody, and the intellectual and moral training of a little girl between one and three years of age to whom they are very much attached and devoted than are the natural parents, who permitted the child to be born out of wedlock, there being no impediment, legal or otherwise, preventing them from being married; who, in pursuance of a prearranged plan and understanding, deliberately made and entered into before the child was born, to prevent their illicit relations from becoming known to others, and presumably to avoid being forced to assume the duties and obligations of the marriage relation, gave the child away a few hours after it was born, with the intention that such relinquishment of the child on their part should be permanent; who, when they learned, three or four weeks after the child was born, that it was afflicted with a malignant eye trouble or disease, and was in danger of losing its eyesight, never went near it for nine months thereafter, during which time they were utterly indifferent to its fate; who have but little affection for each other, and, as far as the father is concerned, none whatever for the child; whose past record shows them to be people of weak moral character, and especially the father, who is shown to be a man of coarse mental and moral fiber, having but little, if any, conception or regard for his moral duties and obligations to the state, society, and to the child. In other words, it is held that under these circumstances it is to the present interest and future welfare of the child to take it from its present pleasant home and congenial environments, and from under the wholesome and elevating influences with which it is surrounded, and place it under the care and control of the Harrisons. I respectfully submit

44 Utah 40

that such holding under the circumstances is not only contrary to the spirit, but is in conflict with the very letter, of the Gray and Hummel Cases and all the authorities therein cited. Notwithstanding I have made a diligent search, I have been unable to find one modern authority that supports the conclusions reached by my Brethren in this case.

For the reasons herein stated, I think the judgment should be reversed, with directions to the trial court to enter an order similar to the order that was directed by this court in its affirmance of the judgment in the case of *Hummel v Parrish, supra.*

ON APPLICATION FOR REHEARING.

FRICK, J.

Counsel for appellants have filed a petition for rehearing which is supplemented by a very lengthy argument. There is nothing contained in either the petition or the argument, however, which was not presented on the first hearing except, perhaps, that Mr. Harrison cannot sustain the action, and even that was anticipated by the Chief Justice in his dissenting opinion. Some of the questions originally argued are now greatly enlarged upon. It is not necessary to outline counsel's contentions, except to say that, with perhaps one or two exceptions, they are fairly reflected by the Chief Justice in his opinion upon the petition for rehearing to which my attention has just been directed. While counsel in their argument in support of the petition for rehearing broadly charge that in my former opinion I departed from the record, yet the only instance in which the charge has any foundation in fact is that in the original opinion I quoted a statement made by Mr. Harker as having been made at a particular conversation, when the truth is that the statement was in fact made in another conversation, and at another time. What I said respecting the statement, while correct so far as the facts are concerned, was incorrect only with respect to the time when it occurred. The inaccuracy, as counsel well knew, was merely inadvertent and thoroughly

harmless. This one instance must suffice as a sample of many other so-called inaccuracies that I am charged with. The judgment of this court must, however, rest upon the whole evidence, including admissions and denials of all of the witnesses, and the presumptions arising from the correctness of the judgment of the trial court, and not upon the detached declarations by either one or the other of the parties, or by merely resting a conclusion upon the statements of one side regardless of the denials of the other.

I wrote the original opinion early in December, 1913, and immediately thereafter passed it to the Chief Justice, and since then I have had ample time and opportunity to consider what I there said. Moreover, since then I have again gone over the record carefully, and, notwithstanding the very vigorous and, in parts, somewhat heated arguments of counsel, I see no cause, either subjective or objective, for changing my views. Nor do I perceive wherein I have transgressed against judicial rectitude. I am sustained in this view for the reason that entirely independently from my examination, my Associate, Mr. Justice Straup, has since then also again carefully read the record, and has reached the same conclusion he reached before.

In view of many things that are said by counsel and approved by the Chief Justice in his later opinion, I might be justified in attempting a reply. I refrain from doing so, not because a complete answer to all that is now claimed is not at hand, but I do so because it must be apparent to all that any answer I might make could in no way convince counsel, and to all others my opinion, as supplemented by the concurring opinion of Mr. Justice Straup, speaks for itself.

It may, however, not be improper for me to suggest what seems to have escaped counsel, that most men are prone to become partisan in precisely the same degree that they become the champions of either persons or causes, and that under such circumstances they soon develop that condition of mind spoken of by the apostle in which, figuratively speaking, they "strain at gnats, and swallow camels." Any an-

swer, therefore, that I might make would be impotent and would engender heat rather than diffuse light. I shall therefore, refrain from any further comment upon the facts, except incidentally.

It is also again strenuously insisted that the majority has not only departed from the rule laid down by this court in the cases of *Stanford v. Gray* and *Hummel v. Parrish,* but that those cases by the present decision are overruled, and that for that reason the appellants have been deprived of some supposed constitutional rights. In making this contention, counsel and the Chief Justice entirely overlook the potent fact that others may not be and are not bound to place the same construction on those cases that they do. While I freely grant them the right to follow their own construction, yet I cannot be influenced in what my judgment and conscience approves simply because some one may disagree with my construction of those cases. The reasons that impelled me to concur in both of the cases referred to are plainly stated in my concurring opinions. The reasons that constrain me now to refuse to rule this case by what is said in those cases I have also stated in my former opinion. I do not say that he who cannot perceive a distinction between this case and the two cases referred to is either judicially blind or unfair; but I do say that to my mind the distinction is as clear as it well can be. In both of those cases we were asked to send the child to a home without a father. Not so here. In this case the child has become legitimated, and now comes into her own. Moreover, had the mother in the Stanford Case merely, by oral arrangment, relinquished the custody of her child for the short space of three weeks and three days, at which time she had recalled and revoked the so-called gift, that case would have been decided differently. The same may be said of the Hummel Case. In the latter case, through a long series of years, the environment of the child was such that it would have been detrimental to its welfare to have changed such environment by surrendering it to its mother. There are other features that distin-

guish this case from the two referred to; but it is needless to dwell upon them now.

The fact that Mrs. Harrison revoked the so-called gift and demanded the custody of her child from appellants is not, and cannot be, disputed. The effect of that demand is, however, sought to be minimized by the claim that Mr., and not Mrs., Harrison is the plaintiff in this action, and that he made no demand until a long time thereafter. This, to say the least, is a novel method of overcoming a demand by the mother of the child. But this contention is quite as devoid of merit as are the others. At the very outset of my former opinion I directed attention to the fact that Mrs. Harrison joined with her husband in claiming the child, and approved all that he had done in bringing the action. She, although not named as a party to the action, was nevertheless a claimant, and as such, under every rule of *res adjudicata,* would be and is bound by the judgment. This is elementary, and it is so whether we regard this as an equitable proceeding, or whether we regard it as merely an application for a writ of *habeas corpus.* Mrs. Harrison having joined her husband in claiming the child in this action, she stands before the courts precisely the same as though she were claiming as a party thereto.

But the equities of appellants are again and again insisted upon as constituting a controlling factor in this case. I pointed out in my former opinion that, had appellants yielded up the child when it was demanded by its mother when but three weeks and three days had elapsed, their equities would be of small proportions. Having refused to surrender the child then, their claims rest upon "self-made ground," and therefore ought not to prevail.

But it is again insisted that Mr. Harrison told the appellants at the hospital a short time after Mrs. Harrison had made the demand that they could keep the child. Mr. Harrison denied appellants' statements in that regard. Not only is this denial ignored, but the contention is seriously made that although Mr. Harrison cannot sustain an action, not even with the consent of the mother

·of the child, yet he could create equities in favor of appellants by some statements that he made in her absence. Could inconsistency go further than this? There is, however, another factor which, in a measure, corroborates Mr. Harrison's claimed denial. I have already referred to it in my former opinion. It is this: Immediately after appellants saw Mr. Harrison at the hospital, when they claimed he told them they might have the child, they went to see an attorney for the purpose of legally adopting the child. Under our statute, if the child be legitimate, and the parents are living, the consent of both parents is necessary to a legal adoption, and, if the child be illegitimate, the consent of its mother, if living, is necessary. Assuming, therefore that some oral understanding is entered into between parties concerning the custody of a child yet such an arrangement could be avoided by either one or both of the parties in any case at any time before the statutory consent is in fact given, and the court has entered a judgment of adoption, as required by the statute. The statute therefore clearly, impliedly at least, authorizes a revocation of merely oral arrangements at any time before its provisions are complied with. But we are ·charged with holding that a parent may reclaim his child from those into whose custody he has given it at any time. All we decide and can decide is that a revocation which is made within three weeks and three days under the circumstances of this case is proper, and that, when a revocation is thus timely made, parties with whom such an arrangement is made cannot prevail as against the parent upon the ground that their equitable rights to the possession of the child are superior to those of the parent. But in this connection Mrs. Harrison's conduct in authorizing Mrs. Phillips to give the ·child away is held up against her in every possible light, except in that light which, in my judgment, a proper regard for human frailties requires. I do not concede it to be my ·duty to assume the role of a moral censor, and as such pass judgment upon the shortcomings and frailties of humanity at large, or of any individual in particular. I conceive it to be my duty to administer the law to all alike, and to protect

the civil rights of the unjust, as well as the just. I am not here either to punish or reward any one. Counsel forget that, while Mrs. Harrison may not be entitled to all the claims of ideal motherhood, she nevertheless is not an outcast, and the immortal lines of Coleridge still apply to her:

"A mother is a mother still,
The holiest thing alive."

While I am a total stranger to all of the parties to this action, and therefore can have no bias either for or against either of them, I nevertheless assert, and I trust I do so with becoming meekness, that in my judgment there is absolutely nothing in this record which justifies either the fervid eulogy of appellants or the severe criticism of the Harrisons. If the Chief Justice's conclusion that because of their conduct, the Harrisons are unfit persons to have the custody of their child is sound, then it must logically follow that they are unfit to have the custody of any child that may hereafter be born to them. Moreover, if a hard and fast rule is to control, it follows that if the Harrisons, because of their moral delinquencies, are both legally and morally unfit to have the custody of their offspring then any other couple who fall into the same predicament are unfit, and all such must yield up the custody of their children when demanded by some more virtuous citizen. This conclusion is manifestly unsound. Both men and women, when young, may go wrong sometimes, and yet in after years develop into good and moral members of society. I am therefore not at all impressed with nor affected by the contention that because the Harrisons are the father and mother of a child born to them out of lawful wedlock, and because she for a time permitted her pride to overcome her motherly instincts, that she for all time must be deemed an outcast, if not an outlaw. Neither do I agree with the Chief Justice in his conclusion that this decision will foster, if not encourage, immorality, nor do I share his solicitude that good people will be discouraged from reclaiming unfortunate children. While I, knowingly, shall do nothing to discourage any good people from taking and holding any unfortunate child, yet if, in

order to encourage such people to do so, I must consent to sacrifice the rights of both the natural mother and the child, the encouragement will not be given. If the Chief Justice labors under the impression that this decision will be followed by any number of people, however small, as a moral guide, he had better be undeceived. In view of the great length of our opinions in this case, but few, not excluding lawyers, will ever read them, and, if we shall keep on adding installments, none will ever have the time to do so. The only real effect of this decision will be upon the appellants and the Harrisons, and they won't care to read it.

Finally, it is charged that the majority of this court has denied appellants the equal protection of the law. That is, that we have sinned against the fourteenth amendment to the federal Constitution, which in the minds of many, like charity, covers a multitude of sins. This claim, at least, possesses the distinction of novelty, if nothing else. But the claim is not more novel than is the method by which it is thrust upon us. The question was not even mooted in the court below nor in this court on the first hearing, nor is it even mentioned in the petition or argument for a rehearing, and yet the Chief Justice is of the opinion that we have as grossly erred in that direction as we have in all other directions. For the reasons just stated, however, we are not only relieved from giving the matter any consideration, but we could not properly do so if we would.

I am firmly convinced that it is not only for the best interests of the child in question that this litigation end here, but I am also convinced that it is also for the best interests of all concerned, not excluding the public generally, that it now end.

The petition for a rehearing is therefore denied.


STRAUP, J.

I, too, think the petition should be denied. Everything presented by it was heretofore presented, considered, and determined. I have, however, re-examined the record, and

with my Associates further considered the case. I am still satisfied the findings of the court below are supported by sufficient evidence, and that the judgment is right and should stand.

McCARTY, C. J.

I am convinced that a rehearing should be granted. The prevailing opinion not only necessarily repudiates the doctrine upon which the Gray and Hummel Cases were ruled and decided, but it establishes a precedent, the inevitable effect of which will be to deter, if it does not wholly dissuade, kind, sympathetic, and benevolent people of this state from receiving into their homes for adoption infant children who have been cast away, deserted, and abandoned by their parents, as the child in question was cast away and abandoned, because, manifestly, no one would be willing to take one of these unfortunate children to rear and bring it up as his own if, as declared in the prevailing opinion, the natural parents may at their pleasure "revoke" or "recall" their act by which they intentionally and voluntarily relinquished the custody of the child to another, and recover possession of it "at any time," regardless of the effect such recall or revocation may have on the interest and welfare of the child. In view of the far-reaching, disastrous, and baneful effect that the prevailing opinion must necessarily have on the lives and destinies of many of these waifs, and particularly on the life of the child in question, I am impelled to make a few observations regarding certain propositions discussed in the prevailing opinion that were either not referred to or but briefly discussed in the foregoing dissenting opinion, and to contend, as vigorously as I can, on moral, legal, equitable, and constitutional grounds, against the result arrived at in the prevailing opinion.

A perusal of the prevailing opinion in connection with the record made in the lower court will show that my Brethren have misconceived the case as to who is the party plaintiff, and have also misconceived the facts, and hence have made a misapplication of legal rules and principles to the facts.

It will also be observed that they have inadvertently over-looked certain findings of fact made by the court, and have assumed the existence of findings of fact that were not made by the trial court.

It will be seen by examining the pleadings that J. B. Harrison is the party plaintiff in the case, and that David Harker and Lucy Harker are the only defendants. Mrs. Harrison was neither a party plaintiff nor defendant, and ·her rights in the premises were not, in a legal sense, in-volved. Nor was there any adjudication of her rights by the trial court. The decree, so far as material here, recites:

"That the said J. B. Harrison, petitioner, is entitled to the custody and control of said Gladys Harrison, and that he is hereby awarded the immediate custody and control of the child."

While it was proper to introduce evidence showing the circumstances and conditions under which Mrs. Harrison gave birth to the child, and the disposition she made of it immediately after it was born, and her attitude towards it for ten months thereafter, for the purpose of enabling the court to determine whether it would be for the present in-terest and future welfare of the child to leave it with the Harkers or to award its custody to Harrison, such evidence, however, could not, under any recognized rule of law or prac-tice, be considered for the purpose of determining or adjudi-cating any claim of right Mrs. Harrison might make to the custody of the child, because, as stated, she is, in a legal sense, a stranger to the action. It seems, however that the judgment is affirmed, on the theory that she is the real party plaintiff, and that it was some claim of right asserted by her to the custody of the child that the trial court adjudi-cated.

In the prevailing opinion it is said:

"I think Mrs. Harrison fully atoned for her weakness and wrong, and it lies neither in the mouths of the courts nor in the mouths of appellants to say that she shall be deprived of the right of parentage because of what she did under the circumstances."

The trial court neither considered, granted, nor denied her right in that regard. She is not before the court seeking vindication for her conduct, or asking that her rights in the premises be adjudicated. The rule is elementary that "the decree must be confined to the interests of the parties before the court." 16 Cyc. 479, and notes. Mrs. Harrison not being a party to the action,, the trial court could not adjudicate any claim of right she might make to the custody of the child. 5 Ency. Pl. & Pr. 955.

As I have stated, it seems that the case is considered and discussed in the prevailing opinion on the theory that Mrs. Harrison, who is not a party but a stranger to the action, is the party plaintiff. In fact, she is in effect substituted and treated by this court as the party plaintiff, instead of Harrison. It is said in the prevailing opinion:

"But have appellants a right to the child's custody for the reason that it is for the best interest and welfare that it remain with them? Upon that question we have the findings and judgment of the trial court against them."

I am unable to agree with my Brethren that the trial court made any such findings of fact, or that any such inference or deduction is permissible or can be drawn from the findings that were made. The only finding of fact made by the lower court as to the fitness of Harrison to have the control and custody of the child is as follows:

"That petitioner (Harrison) is a man who owns considerable land in his own right, and at the time of said hearing was farming other land, and paid rent therefor, and was, at the time of said hearing, building a house for himself and wife; that he is an able-bodied man, and is in as good financial circumstances as the said David Harker, and is equally as well able to care for, protect, and educate the said infant child as the said David Harker."

It is plain that these findings refer only to Harrison's ability in a financial sense to care for, support, educate, and furnish the child a home, and are based solely on the evidence tending to show the amount and kind of property

owned and possessed by him. The trial court, neither ex-
pressly, impliedly, nor otherwise, held in the findings of
fact, conclusions of law, or decree that it is for the best in-
terest and welfare of the child to be taken out of the custody
of the Harkers and delivered into the custody of the Harri-
sons. As pointed out in the former dissenting opinion filed
in the case, the admitted facts absolutely precluded the court
from making any such finding or decision. Again, it is said
in the prevailing opinion:

> "Conceding that she grievously erred and had wronged the child,
> is that sufficient to shut the door of mercy against her for all
> time?"

As I have pointed out, Mrs. Harrison is not before the
court seeking a vindication for what she did, nor is she be-
fore the court asking that it be merciful to her. This con-
troversy involves only certain legal and equitable rights of
J. B. Harrison, the Harkers, and the child in question. In
determining these legal and equitable rights of the respective
parties, including those of the child, this court is committed
to the following doctrine as announced in the Gray Case:

> "Where a parent in writing voluntarily relinquishes and sur-
> renders the custody of his infant child to the custody of another,
> he cannot recover the custody of the child in his own right;
> and, where the parent in such case comes before the court seeking
> to recover the custody of the child, the *burden is on him to show
> not on his own behalf, but on behalf of the child, that it is not
> receiving the proper care, or that its physical, moral, and intellectual
> training is not what it should be."* (Italics mine.)

The prevailing opinion necessarily repudiates this doc-
trine and overrules the Gray Case, because Harrison did not
show, nor was he required to show, "on behalf of the child
that it is not receiving the proper care, or that its physical,
moral, and intellectual training is not what it should be."
But, on the contrary, the undisputed evidence conclusively
shows that the child has received, and will continue to re-
ceive so long as it is permitted to remain with the Harkers,
better treatment and will be surrounded with more whole-

some influence, and that its moral and intellectual training will be far superior than will be accorded to it in the home of the Harrisons. The interest of the child should not, and in fact cannot without offending against law, equity, and justice, be prejudiced because of the sympathy the members of this court may personally feel for Mrs. Harrison, who, in a legal sense, is not even a party to the proceedings. Mr. Justice Frick, in the prevailing opinion (referring to the Gray and Hummel Cases), says:

"We have not the slightest disposition either to modify or depart in any degree from the rule laid down in those cases. The rule, in my judgment, is not only the correct one, but it is the one that is supported by the great weight of authority."

If the rule announced in the Gray Case, to which I have referred, is not repudiated but merely suspended as to this case, then it necessarily follows that the child is denied "the equal protection of the laws."

It is said in the opinion overruling the petition for a rehearing that Mrs. Harrison, "though not named as a party to the action, was nevertheless a claimant, and as such, under the rule of *res adjudicata,* would be and is bound by the judgment." In other words, we are told that a person who is not a party to an action, but who approves of the bringing of the suit, and has an interest in the subject-matter in litigation, is bound by the judgment rendered in the cause. The unsoundness of such a proposition is so manifest that there is no room for serious discussion. For example, suppose the judgment in this case had been in favor of the Harkers and against J. B. Harrison, would it be seriously contended that Mrs. Harrison would be bound thereby, she not having been made a party to the action? I think not, and I venture the statement that no authority can be found that so holds.

In the prevailing opinion it is said:

"While the mother's conduct clearly manifested an intention to give the child to some one, it nevertheless . . . does not necessarily evince an intention to permanently abandon the child to any fate that thereafter might befall it."

It is respondent, not Mrs. Harrison, who is before the court seeking to obtain the custody of the child. He knew before the child was born that it would, immediately after its birth, be given away and sent out into the world an unknown and nameless waif. His admissions under oath and his conduct, as shown by the undisputed evidence, are conclusive that he intended to, and in fact did, abandon the child for ten months thereafter, and was wholly indifferent as to its fate. And the evidence, much of which is set forth in the foregoing dissenting opinion, is just as convincing that Mrs. Harrison, when she gave the child away, also intended to forever abandon it to whatever fate might thereafter befall it. She not only requested Mrs. Phillips to give the child away, but refused to permit her to inform the parties to whom it was given that she was its mother. The Harkers, therefore, received the child and took it into their home without knowing who its parents were.

It is further said in the prevailing opinion:

"The evidence is undisputed that she was induced to part with the child for the reason that she wished to conceal her shame from her folks, especially from her father. Is it a crime for a young, inexperienced girl to seek to hide her shame from her own parents? If so, since when?"

The answer is that it depends upon what she does in seeking to cover up her shame as to whether her conduct in that regard amounts to a crime. Mrs. Harrison's own testimony shows that she permitted Harrison to have illicit relations with her without exacting from him a promise of marriage, and to "conceal" what she had done, and "to keep it quiet," permitted the child, without protest to Harrison, to be born out of wedlock, and in pursuance of a prearranged plan of her own, known to and acquiesced in by Harrison, gave it away and abandoned it, without any intention of ever reclaiming it. In this country such conduct on the part of a mother, who is in full possession of her faculties, toward her child is, and always has been, a great moral wrong—a wrong that is unjustifiable and inexcusable from any viewpoint.

Moreover, it is an offense against good morals and a breach of parental duty that no mother possessing the natural instincts of her sex could, under the circumstances disclosed by the record, be induced to commit. Counsel for appellant, in the discussion of this phase of the case, in their printed brief, state their position as follows:

"It is not contended that Mrs. Harrison committed a crime in trying to hide her shame. But we contend that the fundamental laws upon which the institution of our society rests, the laws of our state and nation, and the Divine law of the Great Master, all unite in declaring that in concealing her disgrace she cannot justify herself in shirking the sacred obligations she owes to her infant child."

In this I agree with counsel. And for a court to hold that Mrs. Harrison's course of conduct with Harrison, and her treatment of her child were justifiable or excusable is, in effect, judicial approval of loose morals, criminal in character, and an indorsement of the most inexcusable of all delinquencies—breaches of parental duty—that it is possible for a mother to be guilty of toward her children. And if such holding by the court is to reflect the public policy of this state in dealing with controversies and questions of this kind, then it necessarily follows that it is but a short step further in the same direction to hold that a mother may, under the same or similar circumstances, and for the same reasons, destroy her offspring. A father who, for the purpose of shirking and avoiding the duties, cares, and responsibilities of the marriage relation, permits his child to be born out of wedlock with the stigma of illegitimacy when, as in the case at bar, "there is no reason in the world why he should not" marry the child's mother, and thereby insure it an honorable birth, and then casts it away and abandons it, as was done by Harrison in this case, is guilty of dishonor bordering on to criminality, that cannot, upon any principle of either law, equity, justice, good conscience, be justified or upheld. Under no circumstances should such perfidy receive judicial recognition. The effect of the prevailing opinion, however, is that Harrison, in order to cover up his

criminal relations with the child's mother, was justified in permitting the child to be born out of wedlock, and then given away and abandoned. In other words, that he, in order to conceal his crime, was justified in pursuing a course of conduct which, in the opinion of the writer, was much more dishonorable and reprehensible than the crime itself..

It is said in the prevailing opinion that:

"It is very clear that Mrs. Harrison's heart before and immediately after the birth of the child was torn by conflicting emotions. of pride and fear on the one side and duty to her child upon the other."

It is also suggested that the fear and dread of her father in particular, and what she might expect from him in case her relations with Harrison should become known, induced her to give away and abandon her child. It is conceded in the prevailing opinion that it may fairly be presumed that Mrs. Harrison, when she got into this trouble, was about twenty-four years of age. And the evidence without conflict shows that she was not living at the home of her father, but was residing with her aunt. Regarding the state of Mrs. Harrison's mind "before and immediately after the birth of the child," we have the evidence of Mrs. Phillips, which is not denied, but which in the main is corroborated by the testimony of Mrs. Harrison, who, it is admitted, was at the hospital eighteen days after the child was born. Mrs. Phillips testified, "Mrs. Harrison during this time mentioned the subject of the baby once that I remember of." And the evidence is undisputed that for nine months after she became advised that the child's eyes were sorely and dangerously afflicted, and that it was in great danger of losing its eyesight, and that later it was stricken with measles and other complaints and disorders common to infants, she never went near the child or offered to assist the Harkers in caring for and nursing it. It requires no argument to show that a true mother could never be guilty of such cold and indifferent conduct toward her infant child and its sufferings as Mrs. Harrison exhibited.

Again referring to the suggestion that it was fear of her father that prompted and induced her to part with the child, I am unable to find a scintilla of evidence in the record that justifies any such conclusion. The only testimony Mrs. Harrison gave regarding her father is the following (quoting from the bill of exceptions):

"Q. Why did you let the child go? A. Because I was— I didn't like my father to hear about it. My folks didn't hear anything about it, and I was going to try and keep it quiet."

As I have pointed out in the foregoing dissenting opinion, the record is all but conclusive that she was not influenced at all in her conduct towards the child and the disposition she made of it because of her father, and that the only recognition she and Harrison ever gave him in these transactions was to use his name in formulating excuses for their unnatural treatment of the child.

I also invite attention to the dissenting opinion where reference is made to certain matters (not here reviewed) that are given much weight in the prevailing opinion in the discussion of which my Brethren have, as I view the record, misconceived the evidence, and have assumed the existence of facts that are at variance with the record as made in the court below. Mr. Justice Frick seems to take the position that by permitting the child to remain in the home of the Harkers would deprive Mrs. Harrison of "her right of parentage" and make of her for "all time an outcast and outlaw." These conclusions are so far-fetched and manifestly unsound and groundless that I deem it unnecessary to consider them.

While this is a *habeas corpus* proceeding, equity and good conscience control and direct, or should control and direct, the discretion of the court. Heretofore I have, in discussing this case, confined my observations to the equities and inherent rights of the child, and have but casually referred to the rights and equities of the Harkers. But few, if any, cases can be found in which the equities of the foster parents

44 Utah 41

are as pronounced and as well established as they are in the case at bar. And, on the other hand, I do not believe a case of this kind can be found where the claims of the natural parent, who has either by word or act voluntarily relinquished his right to the custody of his infant child to others, and, after a *de facto* relation of parent and child has been established between the foster parents and the child, seeks to regain the custody of it, are as devoid of equity and as repugnant to good conscience and every principle of right and justice as they are in the case at bar:

"Equity aids the vigilant, not those who slumber on their rights." "He who comes into equity *must come with clean* hands." "He who seeks equity must do equity." (Italics mine.) 1 Pomeroy's Eq. Jur. 363.

The undisputed facts in this case show that Harrison not only "slumbered on his rights," but that he came into court with his hands smirched with fraud. The evidence is all but conclusive that when he met the Harkers at the hospital about five weeks after the child was born, and a few days after he and Mrs. Harrison were married, and there observed that the child's eyes were afflicted with some kind of malignant disease or ailment, and that it was in danger of losing its eyesight, he stated to the Harkers that:

"He didn't want the baby; neither did his wife want it; . . . that they (the Harkers) should keep it."

And the evidence without conflict shows that for nine months thereafter he neither called to see the child nor made any inquiry of the Harkers concerning it. To permit him, after assuring the Harkers that they would be permitted to keep the child, to recover possession of it, and at the same time to successfully resist their claim for compensation for the trouble they have been to and the expense they have incurred in caring for and rearing the child and saving its eyesight, is to allow him in a court of equity to take advantage of his own fraud practiced on the benefactors of his child. He therefore has come into a court of equity with unclean hands, and is seeking equity without doing equity.

The oft-repeated claim is again made that Mrs. Harrison having modified her intention, or rather changed her mind with respect to abandoning the child, and having "recalled the gift" by which she intentionally and voluntarily relinquished and transferred the custody of it to the Harkers, three weeks after it was made, neither the child nor the Harkers acquired any equities or right under and by virtue of the gift, relinquishment, transfer, and change of custody. I again invite attention to the condition of the child's health at the time, and the circumstances under which the undisputed evidence and the admitted facts show that Mrs. Harrison demanded the return of the child. A few hours after the Harkers received the child they discovered that it was afflicted with a malignant eye trouble or disease—the only thing with which it was endowed by its parents when it was taken to the home of the Harkers—and was in danger of losing its eyesight for the "first eight or ten weeks." The Harkers procured the services of a doctor who, at the time, was giving the child medical treatment for its eyes. They also employed a trained nurse to assist in taking care of it. Mrs. Harrison was an invalid, and without any means, ready or prospective, and was unable to support either herself or the child. And for aught that appears in the record, if her aunt had not furnished her a home and taken care of her, she would have been an outcast and a vagrant. According to her own testimony, which is not disputed, Harrison was not, and had never been, under any legal obligation to marry her, and it is conceded by his counsel that he, at the time, was under no moral obligation to do so. Harrison, speaking through his counsel in their printed brief filed on rehearing, says, "The girl had absolved him, as the record shows, from any obligation to marry her." On that occasion Mrs. Harrison, speaking through her aunt, Mrs. Silcocks, represented to the Harkers that she was an orphan. These facts, which are material and of controlling importance, are not even referred to, much less discussed, in the prevailing opinion. The opinion, therefore, contains errors of omission as well as commission. Under the facts and circumstances just re-

cited, the truth of which is not even questioned, the presumption may well be indulged that, if the Harkers had delivered the child to Mrs. Harrison, it would probably have lost its eyesight, and its life would possibly have been jeopardized. Therefore, as stated in my former dissenting opinion:

"It would have been the worst of recreancy on the part of the Harkers, and in violation of the high moral and sacred duty they owed to the child and to society to properly care for and protect it, for them to have surrendered it to Mrs. Harrison, who was ill and had no means of support (and no property of any kind), and was unable to properly care for either herself or child."

Under the obsolete and antiquated rule of law adhered to by Mr. Justice Straup which regarded the interest and welfare of the child in controversies of this kind of secondary consideration only, Mrs. Harrison could not, under the circumstances, have predicated and successfully maintained an action for the custody of the child on the demand. Of course, if she could not, Harrison cannot legally do so.

Appellants have not only invoked the principles of equity and justice in support of their claim, but, in justification of the position they have taken on the moral phases of the case, have also referred to the Divine as well as the civil law, which under the peculiar facts and circumstances of the case, was apropos and proper. Counsel for respondent in reply, or rather in their evasion of the moral aspects of the controversy, say that they are reminded of the saying that the "Devil can cite scripture for his purpose," and with much satire and ridicule seek to belittle the Harkers. They also refer to maternity hospitals as a "clearing house for nameless children," and say that they "are not quite sure but that hospitals such as the Willowsmere (the hospital maintained by Mrs. Phillips) are, to some degree, a menace to the morals of the community." They concede that Harrison used "bad judgment" in pursuing the course he did to conceal his relations with Mrs. Harrison before they were married; but they contend, if I understand their position, that otherwise his conduct was honorable and praiseworthy. That

is, counsel have the temerity to come into a court of equity
and contend that there was nothing wrong, either legally or
morally, in Harrison's clandestine relations with Mrs. Har-
rison before they were married, and that his conduct in per-
mitting the child to be born out of wedlock and sent into the
world an outcast, nameless and unknown, was not, under
the circumstances, a breach of parental duty, and that the
real wrongdoers in these transactions were Mrs. Phillips and
the Harkers. Speaking of the former, they say: "Mrs.
Phillips, like the gravedigger in Hamlet, sings, no doubt,
while she plies her vocation." Referring to the Harkers and
their connection with the transaction here involved, they
say: "The narrow morality of such cold Puritanism is a
crime, paradoxical as it may seem." In other words, coun-
sel seem to take the position that there is nothing wrong, or
even improper, for a man situated as Harrison was to defile
a young girl and thereby bring into the world an illegitimate
child to be cast away and abandoned, and that the real
offenders against good morals and decency in such cases are,
first, the party who furnishes a refuge for the erring girl,
nurses and takes care of her during confinement, and where,
as in this case, the young mother refuses to keep her child,
finds a good home in which the child may be adopted, prop-
erly cared for, reared, and educated, and, second, the good
people who receive the little outcast into their homes. The
foregoing are samples of the arguments made and the rea-
sons advanced as to why the judgment of the trial court
should be affirmed, the child given to Harrison, and the
Harkers denied compensation for the expense they have been
to in rescuing it from the oblivion to which its parents had
consigned it, and in saving its eyesight and probably its life.
If counsels argument—if it can be called such, made up, as
it is, of satire, ridicule, and abuse of the childs benefactors—
reflects the moral status of respondent and his sentiments
and attitude toward the people mentioned, it necessarily fol-
lows that he is a selfish, heartless ingrate of the coarsest
type, and that the observations made by counsel in effect
characterize him as a degenerate, and remove and dissipate

every possible doubt that might otherwise exist respecting the superior fitness of the Harkers to have the control and custody of the child.

The result reached in the prevailing opinion, as I view the record, is not only unjust to the Harkers, but is a cruel injustice to the child who is made a victim in, rather than a party to, the proceedings. Reference is made in the prevailing opinion to the "hundreds of thousands of lives" and the "thousands of millions of treasure" sacrificed by the people of this country to destroy the institution of African slavery. It is apparent that what is said in that regard is not germane to any issue in the case, or to any question presented by this appeal. But since it is ushered into the case, I remark that I do not know of any feature of African slavery, eliminating bloodhounds and the whipping post, *more unjust, cruel, and inhuman,* as I view this case, than will be the tearing away of this little girl, now three years of age, from the loving and tender care of the Harkers and giving her to the Harrisons, who, so far as this record discloses, have never shown that they possess a particle of affection for her. Nor do I think there was anything in that institution, with the exception referred to, that was more painful and heart-rending than will be the sorrow and mental anguish of the child at the time the separation takes place, and for weeks and possibly months thereafter. And while this cannot be avoided under the law as declared in the prevailing opinion, these parties, including the child, nevertheless are entitled, under section 9 of article 8 of the Constitution of this state, to have the case considered and decided on "the record made in the court below." And this court cannot, without violating this provision of the Constitution, deny them that right. As I have pointed out, this case is not ruled and decided on "the record made in the court below," but on facts assumed which are in some respects wholly at variance with the record. This innovation of the right of these parties to have the case ruled and decided "upon the record made in the court below" is a denial to them, especially the child, of "the equal protection of the laws," and

is in derogation of the spirit, if it does not violate the very letter of the fourteenth amendment to the Constitution of the United States.

Last, but not least, the affirmance of the judgment makes good character and good citizenship a liability rather than an asset in this class of cases, and is a standing rebuke to those who dispense the most ideal and praiseworthy of charities and places the most indefensible and inexcusable breaches of parental duties as well as loose morals at a premium.

The foregoing observations directing attention to wherein the prevailing opinion offends against the Constitution are attempted to be met, or, more correctly speaking, evaded, by Mr. Justice Frick in the following language:

"This claim at least possesses the distinction of novelty if nothing else. But the claim is not more novel than the method by which it is thrust upon us. The question was not even mooted in the court below nor in this court on the first hearing. For the reasons just stated, however, we are relieved from giving the matter any consideration; but we could not properly do so if we would."

What I suggested was that the case be ruled and decided by this court on "the record made in the court below." This the mandatory provision of the Constitution referred to requires. The members of this court have taken an oath that they will "support, *obey,* and defend the Constitution of the United States and the Constitution of this state," etc. (Italics mine.) Is it possible that Mr. Justice Frick regards his oath of office and the provision of the Constitution metioned as possessing "the distinction of novelty if nothing else;" and for that reason he is relieved from observing the one and from obeying the other? This is, in effect, what he says. It will be noticed that it is this court, not the lower court, that has offended against the Constitution. It is in this court, not in the lower court, that facts material and, as I view the case, of controlling importance are not considered or even referred to, and this record, in a metaphorical sense, distorted and padded. Therefore the question, "novel" as

it may appear to my Brother, could not have been presented "in the court below" nor "in this court on the first hearing." It is not a sufficient nor a satisfactory answer to say that, if this opinion should be changed and modified so as to substantially reflect the record as made in the court below, the judgment nevertheless would be affirmed. The decisions of this court on questions presented by appeals, to be of any value as precedents in future litigation and as guides in business matters and other transactions similar to those here adjudicated, must of necessity reflect, substantially at least, the record made in the trial court. In the course of his opinion Mr. Justice Frick says:

"I am a total stranger to all the parties to this action, and therefore can have no bias either for or against either of them."

Nothing having been said, either oral or written, from which it can be inferred that any one has the slightest suspicion that Mr. Justice Frick is either consciously or unconsciously biased for or against any party connected with or affected by the action, I fail to grasp the purpose or to comprehend the materiality of this somewhat unusual declaration by a judicial officer whose integrity, fair-mindedness, and impartiality in deciding cases has never been, and I do not think ever will be, questioned, regardless of whether he may or may not have a personal acquaintance with one or more persons who may be a party or parties to an action litigated in this court. It cannot be that the statement is intended to convey the impression that because he is a stranger to the parties, and hence free from bias, Mr. Justice Frick is therefore less likely to err in his consideration of the case than his associates, because, as he is aware, it developed during the oral discussions of the case in the consultation room that the members of this court, one and all, are total strangers to all of the parties to the action, and that they knew nothing of the case, except what the record discloses. A judicial officer coming forward in defense of his own integrity and fair-mindedness, which is not questioned by any one, may not the members of the legal profession, and the

laymen as well, who may chance to read the opinion containing such matter conclude that there is a bare possibility that it was impelled by the same state of mind that causes a certain class of people mentioned in Holy Writ "to flee when no man pursueth," namely, a troubled rather than a tranquil and undisturbed conscience?

In concluding the somewhat protracted discussion of this case, I invite attention to the following statement in Mr. Justice Frick's opinion, and what, as I view the case, the statement portends:

"While I, knowingly, shall do nothing to discourage any good people from taking and holding any unfortunate child, yet if, in order to encourage such people to do so, I must consent to sacrifice the rights of both the natural mother and the child, the encouragement will not be given."

The significance of this statement is fully appreciated when considered in connection with the facts—not as they are represented to be in the prevailing opinion, but as they are shown to be by the record as made in the lower court. It is that where, as in the case at bar, an unmarried woman gives birth to a child afflicted with a malignant eye trouble that may, and probably will, prove fatal to its eyesight, unless it receives proper nursing and medical treatment, and the mother refuses to keep the child, and, with the acquiescence and approval of its father, sends it into the world a few hours after it is born, a nameless waif, without any intention of ever reclaiming it, to permit good people to receive the little outcast into their homes, give it the proper nursing and medical treatment, save its eyesight and possibly its life, with the assurance that they will be permitted to keep and adopt it as their own, is to "sacrifice the rights of both the natural mother and the child." And that, too, even though the mother is in poor health, depending on the charity of relatives for maintenance, has no home of her own and no prospects of any; she having obsolved the father of the child "from any obligation to marry her." Whereas, to permit the child, under such circumstances, to lose its eyesight or

die from neglect is to protect the rights of "both the natural mother and the child." Such is the logic of the statement when considered in connection with the facts and the result reached in the prevailing opinion.

Keeping in mind the record of this case, it would be difficult, in the face of the prevailing opinion, to conceive of a state of facts under which people, however worthy they may be, could take into their home an infant child who is sent adrift into the world by its natural parents with any degree of assurance that they would be permitted to keep it. Mr. Justice Frick says: "If the Chief Justice labors under the impression that his decision will be followed by any number of people, however small, as a moral guide, he had better be undeceived. . . . But few, not excluding the lawyers, will ever read" the opinion. Are we to understand from this that because the opinions of this court are not read by the public generally, the law governing this class of cases is a "delusion and a snare," and that therefore the pernicious and harmful effect of the decisions will not be as far reaching as I claim for it, and that therefore good people, like the Harkers, will be inveigled to take into their homes infant children who are outcasts with the assurance that they will be permitted to keep and adopt them as their own notwithstanding the children may at any time within one, six or ten months, be taken from them? It would seem so. Otherwise I fail to grasp the purpose or import of the statement.

For the reasons here stated and others set forth in my former dissenting opinion, I dissent from the order overruling the petition for a rehearing.